[File No. 7002]

STATE OF NORTH DAKOTA EX REL. H. E. SYVERTSON, Appellant, v. N. OWEN JONES, as State Highway Commissioner, Fred G. Aandahl, as Governor, and H. W. Swenson, as Treasurer of the State of North Dakota, Respondents.

(23 NW2d 54)

Opinion filed May 20, 1946

*Burtness & Shaft,* for appellant.

468

*Nels G. Johnson,* Attorney General, *P. O. Sathre* and *I. A. Acker,* Assistant Attorneys General, *George F. Shafer* and *C. L. Young,* Special Assistant Attorneys General, for respondents. *Cupler, Stambaugh & Tenneson,* Amici Curiae.

*C. L. Young,* Special Assistant Attorney, for respondent.

470

*Cupler, Stambaugh & Tenneson,* amici curiae.

Per Curiam. The initiative measure known as chapter 339 of the Laws of North Dakota of 1944–1945 is,

"An Act To secure for the state of North Dakota the benefits of federal funds . . . authorizing the state highway department to prepare a highway construction program to be financed by the issuance and sale . . . of state highway revenue anticipation certificates . . . imposing a one cent per gallon motor vehicle fuel tax upon all dealers . . . excepting only motor vehicle fuels sold and used solely for agricultural and industrial purposes, creating . . . retirement fund into which the said motor vehicle fuel tax shall be paid, authorizing the transfer into such fund from the state highway fund of such amounts, not exceeding $250,000.00 in any one year, as may be required to meet any deficit . . . pledging and appropriating such fund for the payment of said certificates, . . . ."

The purpose of this statute, as set forth in § 1 thereof is, "to enable the state to participate in and receive the full benefits of federal funds now available, and to be made available, by acts of congress . . . in the form of grants to the state in aid of the construction and reconstruction of public highways and bridges within this state, . . . ." Further it is the purpose to prevent unemployment and public relief of unemployed and to provide employment for citizens of the state who shall be in need of employment. To carry out this purpose, "The state highway department, as now or hereafter constituted, shall be, and is

hereby, authorized and directed to prepare and provide a plan and program for the construction and reconstruction of public highways and bridges within this state to be financed in part by the issuance and sale of 'state highway revenue anticipation certificates,' as hereinafter provided. Such program and method of financing to be in addition to, and supplemental of, the construction, reconstruction, maintenance and repair of public highways and bridges authorized and being carried on by said state highway department under existing laws; and the power and authority given the state highway department herein shall be in addition to and not in derogation of the powers and authority now vested in the state highway commissioner or the state highway department under any existing law or constitutional amendment now in force or hereafter enacted."

Section 2 authorizes and empowers the state highway department, "to do all acts authorized by this law or necessary to carry into effect the provisions hereof; provided, that nothing in this act contained shall be so construed as to authorize or permit the state highway department or any officer or agency of the state, to create any state debt, or to incur any obligation of any kind or nature except such as shall be payable solely from the motor vehicle fuel tax hereinafter imposed and from revenues accruing to the state highway fund from excise taxes allocated to, and appropriated for, the construction, reconstruction and maintenance of public highways, including the retirement of obligations for the payment of which such revenues are pledged, as directed and required by section 186, as amended, and article 56 of amendments to the constitution of North Dakota, and chapter 169, laws of North Dakota for 1939, and other laws relating to the imposition, collection and use of such excise taxes now in force or amendments thereto. It shall be plainly stated upon the face of each certificate that it is issued under the provisions of this act and that it does not constitute an indebtedness of the state within the meaning of any constitutional provision or limitation."

The statute authorizes the state highway department, after it has prepared its plans and program for the work to be done,

"and has determined the amount that will be required to pay the state's share of the estimated cost of such construction" to prepare and issue "said state highway revenue anticipation certificates in a total aggregate amount not exceeding twelve million three hundred sixty thousand dollars ($12,360,000.00) par value, in form as hereinafter provided."

Provision is made for the form of such certificates, their negotiation, their value, rate of interest, date of maturity, etc.

Section 8 provides that the moneys realized upon the negotiation and sale of the certificates are to be placed, "by the state treasurer in and credited to a fund hereby created to be known as 'state highway special construction fund', and the *same are hereby appropriated* (italics ours) and shall be used and expended only for the construction and reconstruction of such highways and bridges . . . ."

Section 9 provides:

"For the purpose of providing funds for the payment of the semi-annual interest and the redemption of said certificates as the same become payable, there is hereby imposed on dealers in motor vehicle fuels, a special motor vehicle fuel license tax of one cent (1¢) per gallon on all motor vehicle fuels used and sold in the state of North Dakota; which tax shall be separate and apart from and in addition to any license tax or other tax imposed upon or applicable to motor vehicle fuels or dealers therein under the laws of this state, and said additional one cent (1¢) per gallon tax shall be in addition to and over and above the three cent (3¢) tax now imposed and assessed by the initiated measure approved June 30, 1926, and amendments thereof and acts supplementary thereto, known as 'Motor Vehicle Fuel Tax Law', provided, however, that said additional one cent (1¢) per gallon tax shall not be imposed upon or applicable to motor vehicle fuels sold in this state to be used solely for agricultural and industrial purposes and said motor vehicle fuels so sold to be used solely for agricultural and industrial purposes shall be tax exempt, as is provided by chapter 147 of the 1939 session laws of the state of North Dakota, and amendments thereto, or any law hereafter enacted."

Section 10 requires every dealer in motor vehicle fuels as defined by the law described in § 9 to pay this additional 1¢ per gallon tax and by § 11 such dealer is entitled to collect an additional 1¢ as part of the selling price of the motor vehicle fuels.

Section 13 specifies when such 1¢ additional tax becomes collectible. The remaining sections of the statute are as follows:

Section 14: "There is hereby created a special fund to be used solely for the payment and retirement of the certificates authorized and to be issued under the provisions of this act and the payment of the interest to accrue upon said certificates, said special fund to be known as 'state highway revenue anticipation certificate retirement fund', into which fund the state treasurer shall pay or transfer all monies derived from said one cent (1¢) motor vehicle fuel tax and all monies directed by this act to be transferred thereto from the state highway fund."

Section 15: "In the event the amount to the credit of said state highway revenue anticipation certificate retirement fund at any time shall be insufficient to pay the semi-annual interest and pay and retire the principal of said certificates, as they fall due and mature, there is hereby appropriated so much of the funds allocated and appropriated by the constitution and laws of this state for the construction, reconstruction and maintenance of public highways then credited to the state highway fund as may be necessary to meet such deficit in the state highway revenue anticipation certificate retirement fund, not exceeding, however, the sum of two hundred fifty thousand dollars ($250,-000.00) in any one year, which amount so appropriated shall thereupon be transferred by the state treasurer to said state highway revenue anticipation certificate retirement fund and used for the payment of such interest and the retirement of the principal of said certificates so maturing."

Section 16: "The total proceeds of said special license tax of one cent (1¢) per gallon and any monies transferred to said state highway revenue anticipation certificate retirement fund from the state highway fund, as herein provided, are hereby appropriated and allocated without any deduction for administrative costs whatever and shall be expended only for the payment

of the interest to accrue upon said certificates and the payment of the principal and the retirement of said certificates as the same mature or become payable."

Section 17: "The total proceeds of said one cent (1¢) per gallon motor vehicle fuel tax and any monies transferred or to be transferred under Section 15 hereof from the state highway fund to said state highway revenue anticipation certificate retirement fund are hereby irrevocably pledged for the payment of the principal and interest of said certificates, and so long as any of said certificates remain outstanding and unpaid, the laws imposing said taxes shall not be repealed nor shall the same be altered or amended by reducing the amount or the requirement for the collection, disposition and use of said taxes, as herein and in the laws imposing said taxes provided. When there are sufficient funds in said state highway revenue anticipation certificate retirement fund to retire all outstanding and unpaid certificates said tax shall cease and terminate."

Section 18: "If any section, paragraph, sentence, part or provision of this act shall be found by any court to be invalid, it shall be conclusively presumed that this act would have been passed and enacted by the people without such invalid section, paragraph, sentence, part or provision."

The plaintiff alleges the state highway department has prepared and provided a plan and program under the provisions of this act and has determined that the sum of $12,360,000.00 is the amount required to pay the state's share of the estimated cost and, with the approval of the governor, has prepared,

". . . state highway revenue anticipation certificates in a total aggregate amount of $12,360,000.00 in the form prescribed by said Measure, and proposes, . . . to issue such certificates in the total amount of $4,000,000.00 forthwith, and in the additional amount of $2,000,000.00 in the latter part of 1946, and the remainder . . . when deemed necessary . . . in amounts not exceeding $6,000,000.00 in any one fiscal year . . . ."

The complaint challenges the constitutionality of this act on the grounds: that it violates § 25 of the constitution in conferring legislative powers upon the state highway commissioner and the

governor; that it violates § 182 of the constitution in providing for the incurring of a public debt that is not evidenced by a bond issue of the state as required by the constitution; makes no provision for a sinking fund for the payment of the principal and interest of the debt; provides for no levy of an annual tax to meet the indebtedness; and "that said certificates would constitute debts of the state in excess of the maximum debt limit provided by said section." Further, that the law violates the provisions of § 186 of the constitution as amended by article 53 of the amendments in that it provides for "the use and expenditure of funds of the state derived from taxation without appropriation being first made by the Legislature."

The defendants demurred to the complaint "upon the grounds that the same does not state facts sufficient to constitute a cause of action against the defendants herein."

The trial court sustained the demurrer and the plaintiff appeals.

Legislative power cannot be delegated. State ex rel. Rusk v. Budge, 14 ND 532, 105 NW 724. The legislature may delegate to a board or agency the power of administration, in order to carry the legislative will into effect. State ex rel. Gaulke v. Turner, 37 ND 635, 164 NW 924; Neer v. State Live Stock Sanitary Bd. 40 ND 340, 168 NW 601, 18 NCCA 1. Thus matters of administration may be delegated to the authority specified by statute. Efficiency in management requires the exercise of a certain amount of discretion as to the manner in which the legislative mandate may be effectuated. Manifestly the legislature cannot foresee and provide for every contingency. The range of discretion must necessarily vary in accordance with the importance of the work contemplated. Some authority must determine what highway must first be built or repaired; what method of construction shall be employed and other details which depend largely upon judgment, experience and knowledge. We are not prepared to state that there is in this statute any unlawful delegation of power herein. The power given to the officials seems rather to be that of administration merely.

Great stress is laid by the appellant upon the contention that

the initiative measure attempts to create a "special fund" out of State taxes; that the certificates to be issued and sold will create an "indebtedness" of the State; that this debt will not be evidenced by a bond issue; that this indebtedness is controlled by all the provisions of § 182 of the constitution; that the initiative measure is a device based on the "special fund theory," to evade the prohibitions set forth in § 182; and that it will divert revenue of the state to the specific purpose proclaimed in the measure and thus in effect destroy any debt limit provision.

There is no question but that in recent years the "special fund doctrine" has been established—that is, the theory that the revenue obtained from some utility or any public improvement is devoted to the debt created by that utility or improvement as the sole source of payment of the indebtedness and thus does not become a public debt of the state within the meaning of the term indebtedness used in consideration of debt limits. We have so held in this state. See Lang v. Cavalier, 59 ND 75, 228 NW 819. In this case cited we were considering the provisions of § 183 of the constitution dealing with the debt limit of cities; but the principle therein announced is applicable to the debt limit of the state. The general theory set forth in the Lang Case cited is the prevailing rule. Where a law provides for public utilities or improvements, for a revenue therefrom and that all indebtedness created is payable solely from that revenue and not from state taxation this indebtedness is not taken into consideration in determining the debt limit of the state or municipality.

An examination of this economic development shows that the special funds so set up, and which purport to be derived solely from the revenue of the improvement, are almost universally a product of legislation. As such product they are subject to the scrutiny of constitutional provisions. It is possible the proponents of this initiative measure and the people in adopting the same were under the impression that the revenue to be raised by the provision of the initiative measure could be and would be set up under some such "special fund" not heretofore created.

Whatever may have been the theory the fact remains that the initiative measure could not establish any "special fund" by

means of revenue from gasoline tax in the face of the one created by Article 56.

Thus when the initiative measure provides for a tax upon gasoline and these other sources of revenue it does not create a new fund. Article 56 of the amendments requires all revenue raised by such taxation to be devoted to the purpose therein stated. Therefore the revenue to be raised by the initiative measure is part of this fund, and any interpretation of the measure to the effect that it establishes a separate and independent "special fund," must be rejected.

The money raised by this one cent tax is part of the revenue controlled by Article 56 of the amendments.

Thus, in the case at bar we are confronted with a constitutional fund. That the people may establish a "special fund" by constitutional provision cannot be gainsaid. Therefore the controversy here as to the constitutionality of this initiative measure is to be determined by a comparison, interpretation and attempted harmonizing of the provisions of § 182, with § 186 and with Article 56 of the amendments to the constitution.

Section 182 makes provision for the State issuing and guaranteeing the payment of bonds, ". . . , provided that all bonds in excess of two million dollars shall be secured by first mortgage upon real estate in amounts not to exceed one-half of its value; or upon real and personal property of state owned utilities, enterprises or industries, in amounts not exceeding its value and provided further, that the state shall not issue or guarantee bonds upon property of state owned utilities, enterprises or industries in excess of ten million dollars.

*No further indebtedness shall be incurred by the state unless evidenced by a bond issue,* which shall be authorized by law for certain purposes to be clearly defined. Every law authorizing a bond issue shall provide for levying an annual tax, or make other provision, sufficient to pay the interest semi-annually, and the principal within thirty years from the date of the issue of such bonds and shall specially appropriate the proceeds of such tax, or of such other provisions to the payment of said principal and interest, and such appropriation shall not be repealed nor the

tax or other provisions discontinued until such debt, both principal and interest, shall have been paid. No debt in excess of the limit named herein shall be incurred except for the purpose of *repelling invasion, suppressing insurrection, defending the state in time of war or to provide for the public defense in case of threatened hostilities."* (Italics ours)

In 1940 the people approved Article 56 of the amendments of the constitution, which reads as follows:

"Revenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, after deduction of cost of administration and collection authorized by legislative appropriation only, and statutory refunds, shall be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways, and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways."

Article 56 does not prevent the legislative authority from supplying by constitutional means the state highway department with funds from other sources of revenue than those mentioned therein; but it does prevent the diversion from the highway department of any "revenue whatsoever from gasoline and other motor fuel excise and license taxation" and other sources mentioned therein.

Article 56 is not wholly self-executing. The legislative department, which includes the people acting under the initiative, must specify the rate of taxation for the raising of the revenue provided for in the amendment; the legislative department can direct the state highway commission in the expenditures so long as there is no diversion of funds; and the legislative department, within the limitations provided, may specify how these funds may be expended. There is no delegation of legislative power here permitting the highway department to levy any tax it sees fit nor to spend it in any uncontrolled way (that is, there is no such provision in the constitutional amendment). Thus the legislature, in levying additional gasoline taxes, could provide that this additional money, already constitutionally appropriated to the development of the highways, could be used to repay

money borrowed for the building or rebuilding of the highways. The money is already appropriated for the general work, and the legislature could provide that the revenue derived from taxes on gasoline, etc., other than the one provided herein could be used to pay certain specified obligations incurred in the object, or for the building of necessary bridges or any other work within the purview of the object to be accomplished. The people acting under the initiative have the same power. An initiative measure is governed by constitutional provisions. Thus if the legislature should see fit to levy an additional tax on gasoline, it could say on what part of the building or repairing program it should be applied. The only limitation is that it must be used for building or rebuilding, etc., and the payment of the obligations incurred therefor.

Article 56 specifies that the revenue to be placed in this fund may be used in "the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways." A comparison of the provisions in § 186 of the constitution, with reference to the allocation and appropriation of funds for the state highway department, with the provision in Article 56 shows the addition of this phrase, "the payment of obligations incurred."

Any portion of the money in this constitutional fund may be used for the payment of obligations. The initiative measure provides for the incurring of obligations, the proceeds thereof to be used solely for the purposes set forth in Article 56. The proceeds of this tax to be levied and of any and all similar taxes may be used for the purposes set forth in Article 56.

In a sense no construction or reconstruction of public highways could be made without incurring obligations in the form of contracts for building or repair, etc. Clearly the people intended by Article 56 to make the scope broad enough to include such device as the one adopted here—the issuance and sale of certificates of indebtedness. The initiative measure specifically limits expenditures to the construction, and reconstruction and the payment of any obligation arising from such construction, and reconstruction. The repayment of money borrowed for the pur-

poses of building the highways is an obligation contemplated by Article 56 and the amount taken from the other revenue raised by tax on gasoline as levied by the legislature can be used for the purposes specified in section 15 of the initiative measure.

Does the provision of § 182 of the constitution, which prescribes the debt limit apply to the provisions of Article 56?

Clearly the indebtedness incurred by Article 56 is a state indebtedness and, unless Article 56 otherwise provides, the indebtedness would be governed by the limit set forth in § 182 of the constitution. But the people in adopting Article 56, though knowing of the debt limit provided by § 182, intended to permit the creation and provided for the creation of specific obligations limited to those incurred in the construction, reconstruction, etc. of public highways. The people intended that all such revenue as is described in this Article 56—no matter what the amount thereof may be—could be and must be used for the payment of such obligations. This amendment does not attempt to place a limit upon the method of raising the revenue. The state already has levied a tax upon gasoline and other motor fuel and has provided rates of taxation for license, registration, etc. In so far as the rate is concerned there is no hampering of legislative activity. There is no provision for the rate of taxation. The limitation is on the purposes of the expenditure. No limitation is placed upon the amount which may be raised.

This court holds: obligations incurred by the state highway department in the construction, reconstruction, repair and maintenance of public highways are not subject to the limitations of § 182 of the Constitution.

Section 186 of the constitution as amended and now in force, requires that, "All public moneys, from whatever source derived, shall be paid over . . . to the State Treasurer . . . and shall be paid out and disbursed only pursuant to *appropriation first made by the Legislature:* . . . ." (Italics ours) There are exceptions thereto which are not involved in this case. Appellant points out that the appropriation is made in the bill and

contends the constitution prohibits appropriations of public money to be made unless made by the legislature.

However the same section of the constitution provides a standing appropriation for various departments and activities of the State including the "State Highway Department." Section 186 contains this language, ". . . provided however, that there is hereby appropriated . . . the funds allocated under the law to the State Highway Department and the various counties for the construction, reconstruction and maintenance of public roads."

Prior to July 1939 this § 186 of the constitution provided that, "No money shall be paid out of the State Treasury except upon appropriation by law, . . . ." In 1939 this section of the constitution was amended to provide that all public moneys from whatever source derived should be paid over to the State Treasurer and "paid out and disbursed only pursuant to appropriation first made by the Legislature; . . : ." The proviso heretofore set forth was included in the amendment and thus all "funds allocated under the law to the State Highway Department" were appropriated to the department by the people under the constitutional amendment. Thus the people determined that whatever amount of money was allocated to the Highway Department could be used by the Highway Department without appropriation by the Legislature. This section of the constitution did not specify the amount of the fund, nor its source; but it did determine that whatever money was allocated to the Highway Department could be expended without legislative appropriation. The Legislature, and the people in the exercise of the power of initiative, could determine the extent of these funds.

This court holds that the provisions of §§ 15 and 16 of the initiative measure "appropriating" the funds so raised are not in violation of § 186 of the constitution. It is true this § 186 provides that all public moneys from any source whatever must be paid to the state treasurer and cannot be paid out of the treasury except by legislative appropriation; but there is the express ex-

ception in case of money allocated to the state highway department and this money is "appropriated" by the constitutional provision. No further "appropriation" is necessary, nor may the legislature prevent it. Article 56 contains the provision that the moneys in this constitutional fund "shall be appropriated and used solely" for highway construction work; but this appropriation has been made already under the provisions of section 186 of the constitution. This appropriation made in section 186 is not limited to funds already allocated at the time the constitutional provision was adopted. It affects all subsequent revenue raised for this specific purpose.

It is contended that the provisions in § 15 of the initiative measure, allocating to the payment of obligations created by the initiative measure a sum up to $250,000.00 in any one year from the revenue collected under Article 56 violates the constitutional provision dedicating this revenue to the sole purposes of building, repairing, etc., the highways in that it diverts a portion of the revenue in the interest of investors in revenue anticipation certificates and not to the actual building and repairing program.

The initiative measure is not attacked upon the ground that this special tax of one cent per gallon cannot be levied by the people in adopting the initiative measure. It is attacked on the ground that the total amount of indebtedness sought to be incurred exceeds the debt limit. But, as pointed out, Article 56 not only authorizes the payment of such obligations but clearly contemplates the incurring of such obligations no matter what may be their extent, and therefore in adopting Article 56, later in time, clearly provided by constitutional methods for a fund which is not to be considered in determining the extent of the debt limit as prescribed in § 182.

This court therefore holds: the objection that the indebtedness incurred is governed by and exceeds the debt limit is not tenable; that there is a constitutional and continuous appropriation of the revenue provided and that no legislative power is delegated by the measure. Consequently the initiative measure is not vulnerable to the constitutional attack made and the decision of the lower court is affirmed.

MORRIS, BURKE, and NUESSLE, JJ., concur.

CHRISTIANSON, Ch. J. (concurring). I concur in the principles stated in the syllabus, and in affirmance of the order appealed from.

The only ultimate question presented for determination in this case is whether the Initiative Measure, enacted by the people at the election held on the 7th day of November, 1944, and now known as Chapter 339, of the Laws of North Dakota for 1944–1945, is violative of certain provisions of the State Constitution pointed out by the plaintiff. The pertinent provisions of the measure are set forth in the per curiam opinion. In general, I agree with what is said in that opinion, but deem it necessary to state certain additional facts and reasons which lead me to the conclusion that said Chapter 339 is not violative of the constitutional provisions pointed out by the plaintiff.

The plaintiff asserts that said Chapter 339, Laws of North Dakota for 1944–1945 contravenes §§ 25, 182 and 186 of the State Constitution. In plaintiff's complaint it is alleged that said Chapter 339 is unconstitutional for the following reasons:—

1. That the measure provides for the incurring of an indebtedness in excess of the debt limit prescribed by § 182 of the Constitution.

2. That the measure authorizes the incurring of an indebtedness to be evidenced by obligations other than bonds, and without the levy of an annual tax for payment of principal and interest, in violation of § 182 of the Constitution.

3. That the measure authorizes and attempts to provide for the expenditure of public funds without appropriation by the Legislature in violation of § 186 of the Constitution.

4. That the measure vests legislative power in executive officers in violation of § 25 of the Constitution.

In 1918 § 185 of the Constitution was amended so as to authorize the state to "engage in any industry, enterprise or business, not prohibited by Article 20 of the Constitution"; and in harmony with this, § 182 of the Constitution was amended, first in 1918 and again in 1924, so as to authorize the state to issue or guar-

antee the payment of bonds secured by first mortgages upon real estate or upon the real and personal property of state owned utilities, enterprises or industries. As so amended, and now in force, said § 182 fixes the limit of issue of bonds not so secured at two million dollars. Said section also provides: "No further indebtedness shall be incurred by the state unless evidenced by a bond issue which shall be authorized by law for certain purposes to be clearly defined. Every law authorizing a bond issue shall provide for levying an annual tax, or make other provision, sufficient to pay the interest semi-annually and the principal within thirty years from the date of the issue of such bonds . . . . No debt in excess of the limit named herein shall be incurred except for the purpose of repelling invasion, suppressing insurrection, defending the state in time of war or to provide for the public defense in case of threatened hostilities".

If the certificates authorized to be issued under the act in question here are subject to the provisions of § 182 of the Constitution, then it seems quite clear that the act is violative of § 182 of the Constitution. In my opinion, however, these certificates are not subject to, or controlled by, § 182 of the Constitution; but have been wholly withdrawn from the operation of that section by Article 56 of the Amendments to the Constitution. Article 56 was submitted pursuant to initiative petition, and was approved by the people at a statewide election on June 25, 1940.

Article 56 reads as follows:—

"Revenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, after deduction of cost of administration and collection authorized by legislative appropriation only, and statutory refunds, shall be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways, and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways."

Article 56 introduced a new constitutional fiscal policy. It provided that all revenue arising from certain taxes and fees be segregated from all other revenue of the state, and prohibited the expenditure of the revenue so segregated for any purposes ex-

cept for those stated in the article. Was it intended that legislation providing for the incurring of obligations to be paid out of the funds so segregated should be subject to the limitations of § 182 of the constitution?

"The fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent of the framers and of the people who adopted it. The court, therefore, should constantly keep in mind the object sought to be accomplished by its adoption, and the evils, if any, sought to be prevented or remedied by it. The intent may be shown by implications as well as by express provisions." 16 CJS pp. 51–54. See also 1 Cooley, Const Lim 8th ed. p. 138.

"If the language used is clear and unambiguous its meaning and intent are to be ascertained from the instrument itself by construing the language as it is written." 16 CJS pp. 56, 57.

" 'Construction,' as applied to a written constitution, is a broad term. Strictly, the term signifies determining the meaning and proper effect of language by a consideration of the subject matter and attendant circumstances in connection with the words employed. It does not stop with interpretation, but applies the language as interpreted to both the subject matter and the attendant circumstances." 16 CJS p. 48.

It has been said by high authority that "perhaps the safest rule of interpretation" is "to look to the nature and objects of the particular powers, duties, and rights, with all the light and aids of contemporary history; and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed." Prigg v. Pennsylvania, 16 Pet(US) 539, 10 L ed 1060.

If possible, a constitutional amendment "must be harmonized" with the previous provisions of the constitution. But obviously, the purpose of an amendment is to make some change in the constitution, and in case of conflict between the amendment and previous provisions, the amendment must prevail. 1 Cooley, Const Lim 8th ed p 129.

In construing an amendment to the constitution the court should keep in mind the constitution as it existed before the

amendment was adopted, the evils, if any sought to be prevented or remedied by it, as well as the historical development of the amendment. 16 CJS pp. 68, 69.

The record of the proceedings of the Legislature and the laws enacted in this state bear ample evidence that since motor vehicles came into general use, public highways have been a subject of importance and concern in this state. In common with other states, North Dakota provided for the registration of motor vehicles and for motor vehicle fuel taxes.

The revenue derived from motor vehicle fuel taxes and motor vehicle registration fees were utilized largely in the construction and maintenance of public highways, and from time to time there were proposals by individuals and organizations that such revenue should be used solely for such purposes.

There were, also, proposals for the use of such revenue for other purposes, at least one of which was carried into effect by being enacted into law (Laws 1933, Ch. 160, § 11), which provided for a transfer of moneys from the Motor Vehicle Registration Fund to the North Dakota Real Estate Bond Payment Fund to be used for the payment of interest on North Dakota Real Estate Bonds then due or to become due during the years 1933, 1934 and 1935.

In 1934 Congress enacted what is known as the Hayden-Cartwright Act (48 Stat 993 c 586, 23 USCA § 55, 5 FCA title 23, § 55). Section 12 of that act provided:

"Since it is unfair and unjust to tax motor-vehicle transportation unless the proceeds of such taxation are applied to the construction, improvement, or maintenance of highways, after June 30, 1935, Federal aid for highway construction shall be extended only to those States that use at least the amounts now provided by law for such purposes in each State from State motor vehicle registration fees, licenses, gasoline taxes, and other special taxes on motor-vehicle owners and operators of all kinds for the construction, improvement, and maintenance of highways and administrative expenses in connection therewith, including the retirement of bonds for the payment of which such revenues have been pledged, and for no other purposes . . . ."

In 1937 the Legislature enacted Ch. 166, Laws 1937 which provided:

"The proceeds, after deduction of costs of administration and collection, from State motor vehicle registration fees, licenses, gasoline taxes, and other special taxes on motor vehicle owners and operators shall be applied to the construction, improvement, and maintenance of highways and administration expenses in connection therewith, including the retirement of bonds for the payment of which such revenues have been pledged, and for no other purposes."

Said Chapter 166 further provided for the repeal of all acts or part of acts in conflict therewith, and declared the act to be an emergency measure, in full force and effect after its passage and approval. In 1939 the Legislative Assembly amended and re-enacted said Chapter 166, Laws 1937. The only change made was to exclude from the operation of the statute drivers' license fees. The 1939 statute was also passed as an emergency measure. (Laws 1939, Ch. 169). In June, 1938 § 186 of the Constitution was amended pursuant to initiative petition. Article 53, Amendments to the North Dakota Constitution. Such amendment by its terms became effective July 1, 1939. The amendment, which is still in force as part of Section 186 of the Constitution, provides: "There is hereby appropriated . . . the funds allocated under the law to the state highway department and the various counties for the construction, reconstruction and maintenance of public roads."

At the time said Article 53 was submitted to and approved by the electors, the laws of North Dakota provided that moneys in the Motor Vehicle Registration Fund accruing from license fees or from other like sources in excess of the amount required to pay salaries and other necessary expenses shall be transferred quarterly and credited by the state treasurer as follows: 50% to the state highway department and 50% to the counties of the state. Laws 1935, Ch. 177. That the state treasurer shall credit to the state highway department promptly two-thirds of the motor vehicle license tax collected; and that "the money so credited is hereby appropriated to be used" by such highway de-

partment "for the construction, reconstruction, maintenance or repair of highways or roads" under the jurisdiction of the state highway department. Laws 1937, Ch. 168. These laws have remained without substantial change since their enactment. ND Rev Code 1943, 39–0467, 57–4112, 57–4113.

At the time Article 56 was initiated and submitted to and approved by the electors, and during the years immediately preceding, the construction and maintenance of public highways and the financing of such construction and maintenance were questions of great importance. In his message to the Legislative Assembly which convened in January, 1939, the then Governor Noses gave much attention to these questions. He said:—

"Up to this time, the Federal Government has made available large sums of money for construction purposes in North Dakota, without the need of matching funds by the state. Now, however, under the provisions of the Hayden-Cartwright Bill, the state must match Federal funds for new construction purposes, dollar for dollar. There is available for North Dakota in Federal funds for road construction purposes, the sum of $1,742,327 for 1939, and $1,939,847 for 1940, but before these funds can be used by the state, the state must either put up a like amount, or use 90% of its net receipts from gas tax and motor vehicle fees for highway maintenance and construction purposes; otherwise, the Federal funds set aside to North Dakota for 1939 will revert to the Secretary of Agriculture by the 30th of June 1939, and will be allocated to other states."

"The finances of the State Highway Department are not in good condition. I am reliably advised that the sum of $600,000.00 is owing to the Bank of North Dakota for loans made to the Highway Department for construction purposes. I am also advised that there are other outstanding obligations and indebtedness of the department, the amounts of which are not definitely ascertainable. . . . It is definite and certain that unless the state can match Federal funds, the approximately $4,000,000 now available from the United States Government will be definitely lost to North Dakota. It should be borne in mind that in addition to the three cent state gasoline tax, the people of North

Dakota also pay a one cent Federal gasoline tax, levied for the purpose of raising funds for road construction purposes, and that it is thus a large share of our own money which we will be losing if we decide to abandon our road construction program."

In the same message, in discussing the general financial condition of the state, the Governor submitted a statement to the effect that there were outstanding (among other indebtedness), certificates of indebtedness of the state, with interest up to January 1, 1939, aggregating in amount $2,208,535.20, and that there was $194,247.08 in the certificate retirement fund, leaving a net liability of $2,012,788.12 on such outstanding certificates of indebtedness.

In his message to the Legislative Assembly in January, 1941 Governor Noses also dealt rather extendedly with highway problems. He stated:

"On January 1, 1939, the State Highway Department had on hand in cash $596.70 and was indebted in the total sum of $1,085,-194.17. On January 1, 1941, the Highway Department had on hand $290,569.05, and no outstanding indebtedness except for current bills and a promissory note from a former administration to the Bank of North Dakota, in the sum of $600,000, with interest."

Immediately following this, the Governor said:—

"It is my belief that this loan should be repaid, although some doubt exists. as to the legality of the original transaction, and some doubt exists as to the repayment of the loan in view of the nondiversion statute. If you find, however, that the loan can legally be repaid, then I recommend that you, by specific legislative enactment, provide for the repayment thereof, out of Highway Funds, in annual installments, at a nominal rate of interest, extending over a period of years, so as not to seriously impede and retard the program of resurfacing the primary road system of North Dakota."

In conformity with the Governor's recommendation, the Legislature enacted Chapter 48, Laws 1941, which provides: "There is hereby appropriated out of revenues available and to become available to the State Highway Department from gasoline and

other motor vehicle fuel excise and license taxes and motor vehicle registration and license taxes and other special taxes on motor vehicles and on motor vehicle owners and operators, except drivers' license fees, after deduction of administrative and collection costs and statutory refunds, the sum of $600,000.00, together with interest on the sum of $200,000.00 at the rate of two per centum (2%) per annum from July 15, 1938, and interest on the sum of $250,000.00 at the rate of two per centum (2%) per annum from November 17, 1938, and interest on the sum of $150,000.00 at the rate of two per centum (2%) per annum from December 20, 1938, for the repayment to the Bank of North Dakota of the amount of three certain promissory notes, and interest thereon, from date thereof until fully paid at the rate of 2% per annum . . . That the sum of money appropriated hereby shall be paid out of funds accruing to the State Highway Department in annual installments of not less than Thirty-five Thousand ($35,000.00) Dollars and accrued interest at 2 per cent per annum thereof on January 1, 1942, and not less than Fifty Thousand ($50,000.00) Dollars and accrued interest at 2 per cent per annum on each January 1st thereafter until the full obligation is paid."

As the Governor's message shows, it was not an unusual, but rather a common, practice for the state highway department to borrow moneys from the Bank of North Dakota to carry on its work of construction and maintenance of public highways and thus to incur obligations, such as were refinanced by the Legislative Act of 1941. Upon the oral argument one of the attorneys for the defendants, who served the state first as Attorney General and later as Governor, referred at some length to such practice. There was no denial of the accuracy of the statements thus made. It was rather conceded that for a number of years it had been the practice of the state highway department to borrow from the Bank of North Dakota funds to carry on the highway construction program in anticipation of revenue from motor vehicle registration fees and motor vehicle fuel taxes which would later become available to the state highway department.

This, then, is the situation that existed when Article 56 was

initiated, and when it was presented to the people for approval:—The laws of the state (Laws 1939, Ch. 169) provided:—

After deduction of the costs of administration, the proceeds from motor vehicle registration fees, licenses, gasoline taxes (except drivers' license fees), must be "applied only to the construction, improvement and maintenance of highways and administration expenses in connection therewith, including the retirement of bonds for the payment of which such revenues have been pledged, and for no other purposes." Laws 1939, Ch. 169.

The state treasurer was required to credit to the state highway department all moneys (allocated by law to the state), and received by him from such fees, licenses and taxes. (Laws 1935, Ch. 177; Laws 1937, Ch. 168.) There was outstanding certain indebtedness that had been incurred by the state highway department, including obligations to the Bank of North Dakota in the sum of at least $600,000.00, evidenced by promissory note. The state was in danger of losing the benefit of federal funds that had been allocated to it under the Federal Highway Act. The state had outstanding obligations, including certain state certificates of indebtedness, and on these certificates of indebtedness there was on January 1, 1939 a net liability of $2,012,788.12, after deducting the moneys on hand for the payment of such certificates. The law under which these certificates were issued provided:—

"The Certificates of Indebtedness issued under this act shall not be general obligations of the State of North Dakota except to the extent only that the State of North Dakota shall guarantee to pay any deficiency in principal and interest due and payable thereon which may exist at the maturity of such certificates or any renewal thereof in an aggregate amount of not to exceed Two Million Dollars." Laws 1937, Ch. 183, § 4.

The limit of the constitutional debt limit under Section 182 of the Constitution had been reached and there was no authority to incur any further indebtedness at all, even against the revenues arising from motor vehicle and other taxes and required by the law to be devoted to highway purposes. This was the situation in 1940, when the North Dakota County Commissioners Associa-

tion held its annual meeting. The constitutional amendment known as Article 56 was initiated shortly thereafter. The president and secretary of the North Dakota County Commissioners Association were named as members of the "Petitioner's Committee" in the initiative-petitions, and a statement inserted · in the Publicity Pamphlet, over the signatures of the president and secretary stated that the measure was "sponsored by the North Dakota County Commissioners Association", and urged the electors to vote in favor of its adoption. See, McKenzie County v. Lamb, 70 ND 782, 787, 298 NW 241; N. D. Publicity Pamphlet of Statements of Measures, Primary Election, June 25, 1940, p. 7.

It must be assumed that those who prepared the measure and the people generally were aware of the existing situation, of the evil sought to be remedied, and the benefit sought to be obtained by the amendment. The amendment shows on its face that it was prepared with care. In a statement in the Publicity Pamphlet in support of the measure by the president and secretary of the North Dakota County Commissioners Association, attention is called to the fact that constitutional amendments of similar import had been adopted in seven other states. Certain it is that the amendment was intended to aid and facilitate the highway construction program, to preserve the revenues received from the taxes and licenses enumerated and to make it possible for the state to obtain the benefit of the federal grants in aid.

It will be noted that much of the language of Chapter 166, Laws 1937 and Chapter 169, Laws 1939 was borrowed from § 12 of the Hayden-Cartwright Act. And while there has been some re-arrangement of phrases, it is apparent that the drafters of Article 56 adopted much of the language of the preceding acts of the Legislature. There are, however, some significant changes. Thus, Chapter 166, Laws 1937 and Chapter 169, Laws 1939 adopted literally the clause in the Hayden-Cartwright Act to the effect that the proceeds of the taxes specified shall be applied to "the construction, improvement and maintenance of highways, and administration expenses in connection therewith,

including the retirement of bonds for the payment of which such revenues have been pledged, and for no other purposes".

Article 56 of the Amendments makes no reference to the application of the revenue derived from the specified taxes for "the retirement of bonds for the payment of which such revenues have been pledged", but provides instead that the revenue derived from the specified taxes "shall be appropriated and used" for "the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways". The Legislative Assembly which convened less than six months after Article 56 had been adopted, in accordance with the recommendations of the Governor, appropriated moneys from the revenue derived from the taxes specified in the article for the payment of obligations that had been incurred by the highway department for the construction of highways,—obligations in the form of promissory notes given to the Bank of North Dakota for moneys borrowed from the bank for the construction of public highways. Laws 1941, Ch. 48.

Article 56 does not purport to amend any previous provisions of the Constitution. It speaks on a new subject. It announces a new plan—a new fiscal policy. It does not deal with detail or enter into minute specifications, but it does announce a definite principle and prescribe a definite plan. It specifically provides that revenue from the taxes therein specified, "after deduction of cost of administration and collection authorized by legislative appropriation only, and statutory refunds, shall be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways."

"It 'freezes' all the revenues derived from gasoline and other motor fuel excise and license taxation and from motor vehicle registration and license taxes for use for public highway purposes. But it does not 'freeze' all pre-existing statutes relating to such taxes and tax revenues into permanence. It dedicates the revenues in question to public highway purposes without any designation as to the particular highways on which they shall

be used. It leaves to the legislature the allocation of such revenues." McKenzie County v. Lamb, 70 ND 782, 786, 298 NW 241, 243.

It seems quite clear, however, that the constitutional amendment was intended to serve a larger purpose than to restrict the appropriation and use of the revenue from the taxes specified in the article to highway purposes. The appropriation and use of such revenues were already so restricted by legislative enactments and had been so restricted since 1937. But notwithstanding such restriction by the statutes, and the provision therein that the proceeds of such taxes might be applied for "the retirement of bonds for the payment of which such revenues have been pledged," the indebtedness which might have been incurred by bonds so issued was within the limitations of § 182 of the Constitution; and it was doubtless realized that the limit of the indebtedness authorized by § 182 of the Constitution had been reached. However, the highway department from time to time had incurred obligations in the form of promissory notes executed and delivered to the Bank of North Dakota to obtain funds to carry on the highway construction program.

In so far as Article 56 segregates the revenue arising from the taxes and fees specified therein and prohibits the appropriation and use of such revenue for purposes other than those therein specified, it is self-executing; but legislation is necessary to provide for administration and expenditure. McKenzie County v. Lamb (ND) supra.

Article 56 expressly authorizes the appropriation and use of moneys received from the taxes therein mentioned for the payment of obligations that have been incurred for the purposes stated. This of necessity implies authority to incur the obligations which the article says may be paid. While Article 56 "froze" all the revenues, derived "from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes," for public highway purposes, it did not "freeze," or purport to "freeze," the methods of administration, or tie the hands of the lawmakers by limitations upon, or directions as to, the measures the lawmakers might enact to accomplish the pur-

poses to which the revenues were dedicated. The article imposes no restrictions upon the lawmaking power with respect to the expenditure of the funds or the right to incur obligations to be paid from such funds with the single exception of the purposes for which the money may be appropriated and used and for which the obligations must have been incurred in order to be payable from such funds. No limitations are placed upon the form, terms or amount of the obligations that may be incurred and paid. These matters are left for legislative determination; for where a statute or constitutional provision grants a specific power or imposes a definite duty, it also, in absence of a limitation, by implication confers authority to employ all the means that are usually employed and that are necessary to the exercise of the power conferred or to the performance of the duty imposed. State ex rel. Bauer v. Nestos, 48 ND 894, 187 NW 233, 619; 1 Cooley, Const. Lim. 8th ed, p 138.

Article 56 says that the revenue from the motor vehicle taxes and fees may "be appropriated and used . . . for . . . the payment of obligations incurred *in* the construction, reconstruction, repair and maintenance of public highways."

"In" is an elastic preposition and its meaning must be gathered from the context. Black's Law Dictionary, 3d ed. It may be used to express the relation to purpose or result, as well as relation to place, time and condition. The Century Dictionary and Cyclopedia. It may mean "for" or "to." Black's Law Dictionary, 3d ed. The Century Dictionary and Cyclopedia; Webster's New International Dictionary; Funk & Wagnall's New Standard Dictionary; 42 CJS p 475; 36 CJS p 1133, note 62; Grainger & Co. v. Johnson (CCA 6th) 286 F 833, 834, 33 ALR 315.

When Article 56 speaks of "obligations incurred in the construction, reconstruction, repair and maintenance of public highways," it obviously has reference to the purpose for which the obligations were incurred.

Article 56 was not intended to be an idle gesture. It sought to deal with a condition and not merely to announce a theory. According to its terms the revenue therein specified is definitely

and unequivocally segregated from all other public revenues and dedicated solely to the construction, reconstruction, repair and maintenance of public highways, and the payment of obligations incurred for such purposes. It prohibits the appropriation and use of any of such revenue for general governmental purposes or for any purposes other than those stated.

It seems to me that the language of Article 56 evidences an intent that the validity of obligations incurred under that article shall be measured by the provisions of that article alone, and that there was no intention that § 182 and cognate sections of the Constitution should apply to such obligations. However, if there is any doubt as to the meaning of the language, all doubt is dispelled when the article is read in light of the history of the times, the history of the development of the article, and the conditions existing at the time it was initiated and adopted.

Appellant also contends that the law violates the provisions of § 186 of the Constitution in that it attempts to make an appropriation for the payment of the anticipation certificates and the interest thereon. This section, so far as material here, provides "All public moneys, from whatever source derived . . . shall be paid out and disbursed only pursuant to appropriation first made by the Legislature; provided, however, that there is hereby appropriated . . . the funds allocated under the law to the State Highway Department and the various counties for the construction, reconstruction and maintenance of public roads." This provision of the Constitution has been construed and applied by this court in several cases. Langer v. State, 69 ND 129, 284 NW 238; Department of State Highways v. Baker, 69 ND 702, 290 NW 257, 129 ALR 925; McKenzie County v. Lamb, 70 ND 782, 786, 298 NW 241, 243, supra; King v. Baker, 71 ND 125, 299 NW 247; Ford Motor Co. v. Baker, 71 ND 298, 300 NW 435.

In Langer v. State, supra, this court said:—

"The language used in § 186 of the Constitution, as amended, clearly manifests an intention to 'appropriate the necessary funds' required for payment of duly approved claims of the

character stated in the Amendment. . . . But, the appropriation is expressly limited to, and disbursement thereunder may be made only for, the purposes stated." 69 ND at p 161, 284 NW at p 255.

In King v. Baker, 71 ND 125, 299 NW 247, supra, this court had occasion to consider the effect of the appropriation provision of Section 186 of the Constitution as amended in relation to obligations incurred by the state highway department, and it was held that the appropriation made in said Section 186 was sufficient to provide, and did provide, for the payment of a judgment against the state and the state highway commissioner for damages that had resulted to a land owner by reason of the construction of a public highway over his property.

In Ford Motor Co. v. State, 71 ND 298, 300 NW 435, supra, this court, adhering to and applying the rule in King v. Baker, supra, held that the appropriation made in § 186 of the Constitution was sufficient to provide, and did provide, for the payment of a judgment against the state based upon a claim for a refund of taxes illegally assessed and collected.

Appellant concedes that under the rule announced in King v. Baker, supra, the appropriation provision of Section 186 of the Constitution "means that the funds 'allocated' under the law to the State Highway Department are 'appropriated' for the construction, reconstruction and maintenance of public roads." He contends, however, that the section does not appropriate funds for the payment of interest upon, and principal of, the "state highway revenue anticipation certificates" provided for in said Chapter 339; that hence, the appropriation made in Section 186 does not apply to such payments; and that under the provisions of said § 186 appropriation for the payment of principal and interest on such certificates may in no event be made by an initiative measure but can be made only by the Legislature.

The revenue which will be derived from the one cent per gallon tax provided in said Chapter 339, Laws 1944–1945 will obviously fall within the purview of Article 56 and, according to the provisions of that article, be available for appropriation and

use for the payment of obligations that have been incurred for the purpose of construction, reconstruction, repair and maintenance of public highways. Obligations incurred for moneys hired and utilized to carry on such highway work are as much obligations incurred in the construction, reconstruction, repair and maintenance of the public highways as are obligations to persons who perform the work or who sell material used in the construction or maintenance. The appropriation provision in § 186 of the Constitution applies to all "funds allocated under the law to the State Highway Department and the various counties for the construction, reconstruction and maintenance of public roads." Department of State Highways v. Baker, 69 ND 702, 290 NW 257, 129 ALR 925, supra. It applies to all funds so allocated without regard to the time the statute providing the revenue or allocating the funds was enacted, and it applies to claims and obligations that arose before the appropriation provision of the section became effective (Ford Motor Co. v. State (ND) supra), as well as to claims and obligations that have arisen subsequent to the time such appropriation provision became effective. McKenzie County v. Lamb, 70 ND 782, 786, 298 NW 241, 243, supra.

Article 56 authorizes obligations to be incurred for the purposes therein stated and further authorizes payment of such obligations to be made out of the revenue to which the article relates. Questions relating to the issuance of such obligations, and the form and terms thereof, are matters for legislative determination. There is nothing in Article 56 to indicate that the legislative power with respect thereto must be exercised by the Legislature and may not be exercised by the people through the initiative. The issuance and sale of the certificates provided by Chapter 339 are merely steps to obtain the means with which to construct, reconstruct, repair and maintain public highways. Article 56 authorizes such obligations to be incurred and paid out of the revenue which will be segregated and set aside pursuant to its provisions; § 186 of the Constitution appropriates the moneys so set apart and paid into the fund created by Article 56; and said Chapter 339 provides for the incurring of cer-

tain obligations for the construction and reconstruction of public highways, and provides for the payment of such obligations out of the funds so allocated by Article 56 and appropriated for such purposes by § 186 of the Constitution.

The contention that said Chapter 339 delegates legislative power to executive officers is not well founded. The chapter declares the policy of the law and fixes the legal rules which are to control, and merely confers authority upon executive officers as to the execution of the law. This is not a delegation of legislative power violative of the Constitution, but the conferring of power to administer and execute a law. State ex rel. Kaufman v. Davis, 59 ND 191, 229 NW 105.

Chapter 339, Laws 1944–1945 is not violative of any of the constitutional provisions pointed out by the plaintiff. The trial court was correct in holding that the complaint does not state facts sufficient to constitute a cause of action.

BURR, J. (dissenting in part). I cannot agree with the decision of the majority of the court in its entirety. I agree that the initiative measure can be construed so as to show no delegation of legislative power; also that all revenue received from the gasoline and other subjects of taxation mentioned in article 56 of the amendments to the constitution is segregated, to be used solely for the purpose stated in the article. Thus the proceeds of the tax imposed by this initiative measure are part of that fund.

As I view the entire problem the debt created by the initiative measure is a state debt. To have the principle underlying the Lang case that is cited applied to the situation here would require the obligation incurred to be paid solely from revenue earned by the highways. The revenue anticipatory certificates are not payable out of earnings to be derived from the highways. To do so would require a toll road. The certificates are state debts payable by taxation.

I do not agree with the construction given to this article 56 in relation to § 182 of the constitution. The holding of the majority of the court is that while these debts are obligations of

the state, and aggregate over twelve million dollars, they are not subject to the limitations of § 182 of the constitution. Where there are two or more sections of the constitution referring to the same subject and there appears to be some difference between them we adopt the construction that will harmonize them unless there is such an essential conflict that they are contradictory and in that case the later in time will govern. The state may issue unsecured bonds up to two million dollars; may issue bonds in excess thereof if they are secured by first mortgage upon real estate, or upon the property of state owned utilities provided the latter does not exceed ten million dollars; no further indebtedness is to be incurred unless evidenced by a bond issue and no debt in excess of the limit shall be incurred except for repelling invasion, etc. Here are debts of the state to be incurred and exceeding twelve million dollars. If these revenue anticipation certificates are to be construed as bonds it must be admitted that they violate § 186 of the constitution; if not "bonds" where is the constitutional authority to issue them? To avoid this dilemma it is said that such indebtedness is not within the limitations of § 186. Certainly article 56 does not so state. If this be so then § 182 has been amended. There is no reference to amendment in article 56 and to take the obligations referred to therein out of the limitations of § 182 requires amendment by implication. If obligations amounting to twelve millions of dollars may thus be incurred, to be paid out of state taxes on gasoline and the other subjects of taxation enumerated, why not one hundred million dollars? In adopting article 56 did the people intend to thus change § 182? Such amendment by restriction should be shown clearly. The effect is that there would be no constitutional limit whatever in so far as public highways are concerned. The legislative power could levy any tax on gasoline, etc. it saw fit; debts could be contracted at any time and in unlimited amounts to be paid in the dim distant future.

Section 187 of the constitution provides that *"no . . . evidence of indebtedness of the state* shall be valid unless the same shall have endorsed thereon a certificate signed by the auditor and secretary of state showing that the . . . evidence of debt

is issued pursuant to law *and is within the debt limit.*" (Italics mine.) To make the revenue anticipatory certificates valid must they be so endorsed? If § 187 of the constitution does not apply to them is it amended by implication for here are evidences of state indebtedness? Or do these officials certify there is no debt limit whatever as to such certificates?

There is another feature of importance. Briefly it is this— section 186 of the constitution requires that "all public moneys— shall be paid out and disbursed only pursuant to appropriation *first made by the Legislature; . . . .*" (Italics ours.) There are several exceptions, one of which is "the funds allocated under the law to the State Highway Department," are appropriated by the terms of § 186 of the constitution to the state highway department and the counties, for the purpose stated. This section of the constitution as amended was adopted in 1939. At that time the legislature was not required to allocate the revenue raised by taxation on gasoline to the highway commission. It could allocate it to any public purpose. But if it did allocate it then no further appropriation was necessary—the constitution did that. The legislature could not do otherwise.

By article 56 a distinct policy was adopted by the people. When § 186 of the constitution was adopted there was no constitutional fund. The appropriation was of such amount and from such source as the legislature would allocate from time to time. This article created a constitutional fund differing in this respect from § 186. It was adopted to promote construction of highways and to satisfy popular demand that taxes on gasoline and these other subjects should be spent on highways and that all such revenue be appropriated to that purpose, and no other as had been done heretofore. This article says the revenue "shall be appropriated." Who makes the appropriation? The majority of the court says this was done already by § 186.

We have not had occasion before to determine the question of appropriation under article 56. We held in King v. Baker, 71 ND 125, 299 NW 247, that § 186 of the constitution as amended by article 53 made a continuing appropriation; but that was with reference to a claim in existence before § 186 was amended.

With reference to article 56 of the amendments and chapter 169 of the Laws of 1939, we said: "They allocate but they do not appropriate." The appropriation in that case was made under the provisions of § 186 as amended. Now we have a case involving article 56 which provides that the fund "shall be appropriated." With reference to § 186 if my view be correct, this section has been modified by article 56 and has no application here. Why did the people put this provision in article 56? Article 56 of the amendments was not adopted until 1940. The language is somewhat different in this amendment. Section 186 provides the money "is hereby appropriated." The amendment provides that the revenue "shall be appropriated." If already appropriated and thus made a continuing appropriation this language was unnecessary. But it makes provision for appropriation after the adoption of the amendment.

It is true the initiative measure attempts to make an appropriation, but that is of little moment. If the constitution has appropriated the revenue the initiative measure can add nothing to it. If this proviso in § 186 has been modified so that appropriation by the legislature is now necessary, this cannot be done by initiative measure. The constitution defines the legislature. It is claimed the people acting under the initiative are the legislature in a broad sense as they are exercising legislative power. But the people in adopting the initiative knew of section 25 of the constitution, which provides: "The legislative power of this state shall be vested in a legislature consisting of a senate and a house of representatives." After reserving to themselves the power of initiative the people adopted section 186 of the constitution which provides that public money is to "be paid out and disbursed only pursuant to appropriation first made by the Legislature." This they knew meant the senate and the house. The people did not intend to make appropriations by means of initiative measures. The appropriation by this initiative measure has no force. The revenue is appropriated by § 186, or appropriation must be made by the legislature as limited by article 56. By the adoption of article 56 the people modified or repealed that portion of § 186 which provided that "the funds allocated under

504

the law to the State Highway Department" were already appropriated and required that before any portion of the revenue set apart in article 56 could be used by the highway commission for construction, reconstruction, etc., the legislature should appropriate the amount required.

The opinion assumes the provisions of § 186 of the constitution as to appropriation of this highway fund are not affected by the provision for appropriation set forth in article 56.

The wide scope given to this article 56 by the opinion of the court amounts to this: there is no constitutional limit to obligations incurred by the state highway department in the construction, reconstruction, repair and maintenance of public highways and payable from revenues, segregated by article 56; such revenue is already appropriated to the state highway commission; article 56 does not modify the proviso of § 186 making the appropriation and the legislature is powerless to interfere in this respect. I cannot agree with this view.