Argued September 11; writ allowed September 18, 1934

MOSES ET AL. *v.* MEIER ET AL.

(35 P. (2d) 981)

*Willis S. Moore* and *Ralph E. Moody,* Assistant Attorneys-General (I. H. Van Winkle, Attorney-General, on the brief), for petitioners.

*George Neuner,* of Portland, for respondents.

BELT, J. This is an original mandamus proceeding—friendly in nature—to compel the defendant officials jointly to execute and issue certificates of indebtedness of the par value of $250,000, to meet the

demands for unemployment relief as provided by section 2, chapter 93, Oregon Laws, Second Special Session, 1933. The demurrer to the alternative writ presents the question as to whether the issuance and sale of such certificates of indebtedness as authorized by the above act would be in violation of Article XI, section 7, of the Constitution of this state which, so far as material herein, provides:

"The legislative assembly shall not lend the credit of the state nor in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of $50,000, * * *."

To fully comprehend the legal question presented it is deemed necessary to review briefly the history of certain legislative enactments whose object and purpose was to relieve distress and suffering resulting from unemployment. Recognizing the suffering and hardships caused by the unemployment situation, the legislature, at its regular session in 1933, created a "State Relief Committee" to supervise the administration of unemployment relief throughout the state and to cooperate with the federal government in such work (chapter 15, Oregon Laws, 1933). At the same session of the legislature, a law was enacted creating a "State Unemployment Relief Fund" whose funds were to be expended by the state relief committee with the consent of the governor (chapter 409, Oregon Laws, 1933). At the second special session of the legislature in 1933 the "Oregon Liquor Control Act" was enacted to regulate and control the manufacture and traffic in alcoholic beverages. Under section 40 of the act, all moneys collected by the commission administering the act, with the exception of license fees provided

therein, were required to be deposited in the general fund of the state to the credit of the Oregon state liquor commission account. After payment of expenses of administration of the act, the balance of the moneys remaining in said account, in excess of $50,000, was to be distributed as therein provided. That portion of the money (75%) which went to the various counties of the state was to be used for "mother's aid, old age pensions and direct relief of the indigent". The remaining 25 per cent of the net proceeds was to revert to the general fund of the state. For the purpose of carrying into effect the provisions of the act there was appropriated the sum of $400,000. Provision was made for repayment of the sum appropriated "from the first moneys accruing from the operation of this act, *subsequent, however, to any appropriation for unemployment relief made by the special session of the Oregon legislature which convened November 20, 1933, from revenue derived under the provisions of this act;* * * *". On the same day that this act was passed, filed with the secretary of state, and approved by the governor, the legislature (chapter 93, Oregon Laws, Second Special Session, 1933) appropriated the sum of $3,000,000, "or so much thereof as may be necessary or be made available from all of the net proceeds of revenues authorized and directed by law to be raised from the manufacture, sale, distribution, taxing or licensing of liquor which would otherwise be apportioned to the state government, or the county and local governments, or both, notwithstanding the general provisions of any other act providing for the distribution of revenues raised from the manufacture, sale, distribution, taxing or licensing of liquor, to the state government, or the county or local governments,

or both''. It was further provided in section 1 of said act that ''Said funds shall be paid to the state treasurer and credited by the treasurer to a *fund separate and distinct from the general fund* to be designated the state unemployment relief fund, to be disbursed and accounted for in the manner provided by law''. Section 2 of the act provides:

''If at any time the moneys in the unemployment relief fund shall become exhausted, or pending the credit of revenues thereto, the treasurer shall be and hereby is authorized and directed to borrow from the most advantageous sources, such amounts as shall be necessary to pay all lawful claims filed against said unemployment relief fund with the secretary of state in pursuance of law, and the governor, secretary of state and state treasurer, jointly, shall issue certificates of indebtedness therefor, which certificates shall draw not to exceed the legal rate of interest until redeemed. Said certificates shall be payable solely from the revenues to be derived from the sources mentioned in section 1 of this act; provided, that the total amount of moneys expended, including that borrowed by the state treasurer and certificates issued therefor pursuant to the provisions of this section, shall not exceed the amount appropriated by this act.''

It will thus be seen that the ''State Unemployment Relief Fund'' is maintained by virtue of the companion acts above mentioned. The provision in the Oregon liquor control act relative to the repayment of the money appropriated for administration of the act is subordinate to the appropriation for unemployment relief. The relief of the poor and distressed was foremost in the mind of the legislature. The provision in section 40 of the liquor act that such repayment was ''subsequent, however, to any appropriation for unemployment relief'' clearly refers to the appropriation

of anticipated revenue accruing to the state from the manufacture and sale of alcoholic beverages. The intention of the legislature is plain when the purposes and objects of the two acts are considered. It is important at this juncture to note that the state unemployment relief fund is, by virtue of section 1 of chapter 93, Oregon Laws, Second Special Session, 1933, "separate and distinct from the general fund". When the fund becomes exhausted—as the demurrer admits in the instant case—and the state relief committee in administering the fund is unable to pay all lawful claims against it, it becomes the duty of the state treasurer to borrow a sufficient amount of money, not in excess of the amount appropriated, to replenish the fund. The certificates of indebtedness issued against the relief fund to secure the loan are, under the express provisions of the above act, payable solely from the revenues derived from the "manufacture, sale, distribution, taxing or licensing" of alcoholic beverages, and it should so state on the face thereof.

From the above statutory provisions it is clear that these certificates of indebtedness drawn on a special fund and to be paid solely from anticipated revenue derived from the manufacture and sale of alcoholic beverages are not general obligations of the state. In the event the anticipated profits do not materialize and the fund becomes exhausted, the purchaser of such certificates has no legal redress against the state. He must look solely to the fund upon which they are drawn. Whether there would be a moral obligation to redeem such certificates of indebtedness is a matter with which this court is not concerned. Suffice it to say there is no legal obligation to do so in the event the special fund is exhausted.

Does this legislative act authorizing the issuance and sale of certificates to secure money for the purpose of relieving the suffering and distress of the unemployed transcend the Constitutional limitation against indebtedness? Article XI, section 7, of the Constitution, was enacted by the people as a protection against burdensome and excessive taxation. In the event the net revenues turned in to the relief fund are insufficient to redeem the certificates of indebtedness, there will be no additional tax burden by reason thereof for, as previously stated, there is no general obligation on the part of the state to redeem them. A "debt" within the meaning and purview of the Constitutional provision in question is that which the state in any event is bound to pay: *Alabama State Bridge Corporation v. Smith*, 217 Ala. 311 (116 So. 695). That it is a proper function of the state government to appropriate funds for relief of distress caused by widespread unemployment is conceded in all jurisdictions. It is not questioned here. Neither is there any question about wrongful diversion of funds. The sole issue is whether there has been a violation of the Constitutional provision relative to limitation of indebtedness.

In the instant case a special fund has been created and it is to be sustained and maintained by taxes levied and revenues obtained for a special purpose, viz., the "relief of the indigent". The funds which are derived from the operation of the Oregon liquor control act and which, by virtue of the companion act (chapter 93, Oregon Laws, Second Special Session, 1933), are credited to a special fund separate and distinct from the general fund, are to be used for the particular purpose contemplated by the liquor control act. The

funds in question never became a part of the general fund under the express provisions of section 1 of chapter 93, Oregon Laws, Second Special Session, 1933. We are not dealing with a case where funds created for a general governmental purpose have been diverted to a special fund. This is a case where the revenues transferred to the special fund are to be used in keeping with the purpose of the act producing them.

The recent case of *Ajax v. Gregory* (Washington), 32 P. (2d) 560, is squarely in point and supports the contention of the plaintiffs herein that the act under consideration is not unconstitutional. Under the Washington state liquor act the state liquor control board was authorized to issue and sell bonds payable only out of the "liquor revolving fund" in the amount of $1,500,000. It was further provided that each bond and interest coupon attached thereto should show on its face that it was payable solely from the liquor revolving fund and not otherwise and that the state of Washington in no event should incur any liability or obligation. Under section 73 of the act the "liquor revolving fund" consisted of all license fees, penalties, forfeitures, income or revenue received under the act. The plaintiff therein, who was the operator of a drug store, brought an injunction suit to restrain the state liquor board from operating under the act for the reason, among others, that the authorization to issue and sell bonds was in violation of the state Constitution limiting indebtedness. The Supreme Court of Washington, in upholding the validity of the act, said:

"Article 8 of the Constitution of this state places a limitation upon state indebtedness, but the provisions of this act in no way conflict with such limitations. As already pointed out, the act expressly provides that

all expenses arising under the administration thereof shall be paid from the liquor revolving fund, and that each bond and the interest coupon attached shall show on its face 'that it is payable solely from the liquor revolving fund and not otherwise, and that neither the State of Washington nor the board nor any member thereof shall incur any liability or obligation by reason of the authority granted in this section'. Under those provisions, there is not created any state indebtedness within the contemplation of the Constitution.''

In this state there is the closely analogous case of *McClain v. Regents of University,* 124 Or. 629 (265 P. 412). The act involved therein authorized the regents of the university, acting as an agency of the state, to sell bonds for the purpose of constructing a dormitory and provided that the principal and interest of the bonds should be paid solely from the net income from the rentals of the building. This court upheld the constitutionality of the act since there was no liability against the state and the bondholder was obliged to look exclusively to the special fund consisting of the net rentals and income from the building. We see no substantial distinction between that case and the one at bar.

The rule which was the basis of the decision in the university case was recognized by this court in *Wingate v. Clatsop County,* 71 Or. 94 (142 P. 561), and was thus stated:

"* * * where a fund has been provided for, although not collected, or where an appropriation has been made of anticipated revenue, and the contract is payable out of such funds, the contract does not create an indebtedness within the meaning of the Constitution." Citing, *Municipal Security Co. v. Baker County,* 33 Or. 338 (54 P. 174) ; *Eaton v. Mimnaugh,* 43 Or. 465 (73 P. 754) ; *Bowers v Neil,* 64 Or. 104 (128 P. 433).

The "Special Fund Doctrine" was recognized in *Rorick v. Dalles City*, 140 Or. 342 (12 P. (2d) 762), wherein it was said:

"The rule is well settled in this state, and we think in other jurisdictions, that obligations payable out of a particular fund, and for which the fund only and not the municipality is liable, are not within the inhibition of this and other similar statutes." Citing, among other cases, *McClain v. Regents of University*, supra.

The court refused, however, to apply such rule for the reason that it appeared upon the face of the bonds which the defendant city proposed to issue and sell for the purpose of constructing a toll bridge across the Columbia river, that, in the event the revenues from the bridge were insufficient to retire the principal or the interest, the city would, in the event of a deficit in interest, pay the same. In that case there was a contingent liability. Hence the limitation against indebtedness applied.

Also see the analogous cases of *California Toll Bridge Authority v. Kelly*, 218 Cal. 7 (21 P. (2d) 425); *Briggs v. Greenville County*, 137 S. C. 288 (135 S. E. 153); *Klein et al. v. City of Louisville et al.*, 224 Ky. 624 (6 S. W. (2d) 1104), supporting the contention of the plaintiffs herein.

Having been convinced that the act does not violate the Constitutional limitation of indebtedness, it follows that the demurrer to the alternative writ will be overruled. Since no question of fact is involved, and it would be idle for the defendants to answer, a peremptory writ will issue in accordance with the prayer of the petitioners.

RAND, C. J. (dissenting). The constitution of this state, by article XI, section 7, provides:

"The legislative assembly shall not lend the credit of the state nor in any manner create any debt or liabilities which shall singly or in the aggregate with previous debts or liabilities exceed the sum of $50,000,
*   *   *  "

except in certain cases not material here.

The acts of the legislature now under consideration purport to authorize the state to borrow large sums of money in excess of the constitutional limitation and to undertake their repayment from a fund to be later created and to be known as the "State Unemployment Relief Fund", which is to consist wholly of future profits expected to be realized by the state from its conduct of the liquor traffic. The amount appropriated for the relief purposes specified in the act is three million dollars. The moneys so appropriated are not now in existence but are to be realized wholly in the future from the profits of the business. Under the provisions of these acts, none of the moneys to be borrowed are to be used to enable the state to engage in the business and no part of the expected profits will be derived from the use of the borrowed money. The state is already engaged in the traffic and has furnished money from its own funds for that purpose. In other words, the incurring of the debt will neither add to nor decrease the amount of the profits which the state will realize from such traffic since the state is already engaged in the business and all past and future expenses of such business either have been or will be paid by the state from other state funds.

It is obvious, therefore, that these anticipated profits, when obtained, will be as much the property

of the state as any other of its future state revenues, whether such state revenues are derived from taxation or otherwise. The debt, therefore, will not be created for the purpose of earning revenue for the state, or of increasing the revenue of the state, for those revenues will be earned whether the money is borrowed or not. When the debts are incurred, they will be paid wholly and alone with moneys belonging to the state and this is true whether the debt is paid from the general fund or from a special fund created for that purpose.

The inhibition of the constitution is not against the appropriation of three million dollars but is against the incurring of the debt. Had the legislature appropriated that much money for the purposes stated in the act and had provided that it should be expended only when and as earned and had not authorized the incurring of the debt, the objection now urged against the act would have been obviated. But such is not the case. The money is to be first borrowed, then expended in relief work, and later is to be repaid by the state from moneys belonging to the state but out of a particular fund created by the state and consisting wholly of state money.

Under such circumstances, the fact that the debt is not to be paid from the general fund but is to be paid from a special fund is of no importance, unless we are to attach to the words "special fund" some magical effect which they do not possess.

If this act is constitutional, then it is within the power of the legislature to authorize the borrowing of any amount of money in excess of the constitutional limitation by merely providing that some part of the future revenues of the state, when received, shall be

set apart in a special fund from which the debt shall be paid and also providing that the same shall be paid from the special fund and not from the general fund. Such a doctrine will mean the entire abolition of all constitutional provisions restricting the borrowing of money by the state.

For these reasons, I am compelled to dissent from the majority opinion of the court.