Argued and submitted on petition of Walsh Construction Co.
June 4, constitutionality upheld June 26, 1975

IN THE MATTER OF THE CONSTITUTIONALITY OF
THE AMENDMENTS TO ORS 456.720
WALSH CONSTRUCTION CO., *Petitioner, v.*
SMITH, *Respondent,*
GIBSON ET AL, *Interested Persons.*

537 P2d 542

*Jonathan A. Ater* of Lindsay, Nahstoll, Hart, Dafoe, & Krause, Portland, argued the cause and filed a brief for petitioner. Howard A. Rankin of Rankin, Walsh, Ragen & Roberts, argued the cause and submitted a brief amicus curiae for Blyth Eastman Dillon & Company in support of petitioner.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

*William G. Paulus* of Paulus & Callaghan, and Fred H. Paulus, Salem, argued the cause for interested persons Rex Gibson and Norma Paulus. With them on the brief was George A. Rhoten, Salem.

O'CONNELL, C. J.

This is an original proceeding brought in this court as provided in Chapter 97, Oregon Laws 1975, to determine the constitutionality of certain provisions of the Oregon Housing Act, ORS 456.550 to 456.720. Petitioner, respondent, and amicus curiae Blyth Eastman Dillon & Company contend that the provisions in question are constitutional. Rex Gibson and Norma Paulus, appearing as "interested persons," take the contrary view. We shall refer to Gibson and Paulus as intervenors.

The 1973 Oregon Legislature enacted the Oregon Housing Act, ORS 456.550 to 456.720, the purpose of which is to assist in the financing of the construction and rehabilitation of low-income housing by providing a pool of mortgage funds from the sale of bonds. The bonds are to be revenue bonds as distinguished from general obligation bonds, that is,

the bonds are to be repaid solely from the revenues of the housing projects, rather than taxation.[①]

The Act provides for the creation of a capital reserve account within the Housing Finance Fund equal to the maximum annual debt service on the bonds. The controversy has arisen as to the constitutionality of a former section of the Housing Finance Fund Act that provided for the replenishment of any deficiency in the reserve account. This section is referred to by counsel as the "moral make-up" clause.

As enacted in 1973, ORS 456.720 (5) provided:

"In order to assure the continual operation and maintenance of the capital reserve account in the Housing Finance Fund and to carry out ORS 456.615 to 456.720, if the amount of money on deposit in the capital reserve account in any year is less than the debt service reserves described in subsection (1) of ORS 456.655, the administrator *shall* certify to the Governor the amount of such deficiency as required to restore the account to its required debt service reserves. Upon receipt of the certification of the amount of the deficiency, the Governor *shall* include in his next budget request to the Legislative Assembly the amount certified by the administrator. The amount so certified by the administrator *shall* be appro-

---

[①] ORS 456.665 provides as follows: "* * * (3) All obligations issued by the division under ORS 456.550, 456.570 and ORS 456.610 to 456.720 shall not constitute a debt, liability or general obligation of this state or of any political subdivision thereof or a pledge of the faith and credit of this state or any such political subdivision, but shall be payable solely from the revenues or assets of the division acquired pursuant to ORS 456.550, 456.570, and 456.610 to 456.720. Each obligation issued under ORS 456.550, 456.570, and ORS 456.610 to 456.720 shall contain on the face thereof a statement that the division shall not be obligated to pay the same nor the interest thereon except from the revenues or assets pledged therefor and that neither the faith and credit nor the taxing credit of this state or any political subdivision thereof is pledged to the payment of the principal of or the interest on such obligation. * * * * *"

priated by the Legislative Assembly and paid to the division during the then current fiscal year for deposit in the capital reserve account." (Emphasis added.)

In *Gibson v. Smith,* 20 Or App 264, 531 P2d 724 (1975), the Court of Appeals held ORS 456.720 (5) unconstitutional on the ground that it violated Article XI, § 7 of the Constitution of Oregon by creating a debt in excess of $50,000.[2]

In 1975 the Act was amended to change the word "shall" as applicable to its obligation to "make-up" the deficiency to the word "may". Chapter 97, Oregon Laws 1975, reads as follows:

"* * * In order to assure the continual operation and maintenance of the capital reserve account in the Housing Finance Fund and to carry out ORS 456.615 to 456.720, if the amount of money on deposit in the capital reserve account in any year is less than the debt service reserve described in subsection (1) of ORS 456.655, the administrator shall certify to the Governor and to the Legislative Assembly or, during the interim, to the Emergency Board the amount needed to restore the account to its required debt service reserves. The amount so certified by the administrator *may* be appropriated by the Legislative Assembly or, during the interim, allocated by the Emergency Board and paid to the division during the then current fiscal year for deposit in the capital reserve account. * * * * *"

Petitioner requests us to determine the constitutionality of this section because it is uncertain from the opinion in *Gibson v. Smith, supra,* whether the Court of Appeals would treat the amendment as cur-

---

[2] Article XI, § 7 provides in part as follows: "The legislative assembly shall not lend the credit of the state nor in any manner create any debt or liability which shall singly or in the aggregate with the previous debts or liabilities exceed the sum of $50,000 * * *."

ing the constitutional defect. This uncertainty arises from the following language in *Gibson v. Smith, supra* 20 Or App 264 at ——.

"* * * We do not think it can effectuate what it purports to do by the indirection of seeking to create by such wording in a statute a so-called 'moral obligation' to pay from general funds despite the constitutional proscription either. One reason for this is because, as we have noted, doing so would bear characteristics of misrepresentation which could eventually result in an indirect legal defeat of the positive direct proscription, regardless of whether the future legislature considered liability as being moral only. * * *"

■ ORS 456.665 could not state any more explicitly that the obligations issued under the Housing Act are not to constitute a debt, liability or obligation of the State of Oregon, but are to be paid solely out of revenues. Looking at this section alone, it is clear that the proscription of Article XI, § 7 is not violated. It is argued, however, that ORS 456.720, which authorizes the appropriation of general revenues of the state for the purpose of restoring the deficiency in the capital reserve account imposes upon the state a general obligation prohibited by Article XI, § 7. It is contended that the amendment of ORS 456.720 (5), substituting the word "may" for the word "shall," does not cure the constitutional defect because, although the restoration of the deficiency is not made mandatory, the statutes "still retain the potential for use of the general revenues of the state for the purposes of the housing program," and therefore, "[t]his provision * * * removes the obligations from the category of simple revenue bonds."

The intervenors distinguish *McClain v. Regents of the University,* 124 Or 629, 265 P 412 (1928), on the ground that in that case the bonds involved were payable only from the net rentals of a University of Ore-

gon dormitory and the revenue from the rentals could not, as in the present case, be supplemented by an appropriation of general revenues of the state by a future legislature. In emphasizing the fact that the dormitory bonds were payable solely from dormitory rentals, the court said:

"We conclude that neither the funds of the state nor the University fund, nor any other funds now controlled by or belonging to either the state or the University, will, in any way, be impaired or drawn upon in the event that this dormitory is constructed under the proposed plan. Plainly no debt is created within the meaning of the Constitution." 124 Or at 638.

The more recent case of *Carruthers v. Port of Astoria,* 249 Or 329, 438 P2d 725 (1968) is similarly distinguished in that no provision was made for paying the bonds other than through the revenue derived from the facility being constructed.[3]

██ Intervenors regard the presence of a make-up provision as a pledge of the state credit because a bond dealer or vendor of certificates would point to the statute as an assurance to potential buyers of the certificates of indebtedness, that if the source of payment of the certificates should prove insufficient, a future legislature would come to the rescue with an appropriation of state funds to prevent or overcome a default. Certainly the purchasers of the bonds cannot predicate such an expectation upon any legal obligation of the state because the bonds themselves are required to contain a statement to the contrary. If there is a pledge, then, it is at most based upon a moral obligation which the members of future legislatures might feel to meet the deficiency. We do not interpret Article XI, § 7 as prohibiting such a moral and therefore unenforceable pledge.[4] It is not neces-

[3] See also Moses v. Meier, 148 Or 185, 35 P2d 981 (1934).

[4] *Id.,* 148 Or at 189.

sary for us to decide whether the result would be different if the statute contained the word "shall" rather than "may" as it did prior to the 1975 amendment.[9]

The intervenors also attack the Housing Act on the ground that Section 2 of the Act requires this court (1) to render an advisory opinion, and (2) to take original jurisdiction in a case not authorized by Article VII (Amended), § 2 of the Oregon Constitution.

Section 2 of Chapter 97, Oregon Laws 1975, provides as follows:

"(1) Jurisdiction for the determination of the constitutionality of this Act and these amendments to ORS 456.720 is vested exclusively in the Supreme Court of the State of Oregon.

"(2) The State Treasurer or any interested person may petition the court for determination of the constitutionality of this Act within 30 days of its effective date.

"(3) A petition for determination of constitutionality under subsection (1) of this section shall bear the caption: 'In the matter of the constitutionality of the amendments to ORS 456.720.'

---

[9] Cases in other jurisdictions have held that even where the statute purports to require the legislature to replenish the fund, the constitutional proscription against pledging the credit of the state is not violated. Massachusetts Housing Finance Agency v. New England Merchants Nat. Bank of Boston, 356 Mass 202, 249 NE2d 599 (1969); In re Advisory Opinion, 380 Mich 554, 158 NW2d 416 (1968). This result is reached on the ground that one legislature cannot impose a legal obligation to appropriate money on succeeding legislatures. *See also*, Martin v. North Carolina Housing Corp., 277 N C 29, 175 SE2d 665 (1970) (permissive make-up); Johnson v. Pennsylvania Housing Finance Agency, 453 Pa 329, 309 A2d 528 (1973) (mandatory inclusion in Governor's budget); Opinion to the Governor, 308 A2d 809 (R.I. 1973) (same); State ex rel Warren v. Nusbaum, 59 Wis2d 391, 208 NW2d 780 (1973) (same). *Cf.*, Minnesota Housing Finance Agency v. Hatfield, 297 Minn 155, 210 NW2d 298 (1973). *But see* Casey v. South Carolina Housing Authority, — SC —, 215 SE 2d 184 —— (May 27, 1975).

"(4) Upon the filing of a petition for determination the court shall hear the matter within 30 days. Interested persons may file briefs and present arguments on such conditions and within the time the court may specify."

■ The foregoing provision could be interpreted broadly to require this court to determine the constitutionality of provisions of the Housing Act upon the request of the State Treasurer or any interested person, even where no controversy has arisen between the parties. In that case, our decision in In re Ballot Title, 247 Or 488, 431 P2d 1 (1967), holding that the rendering of advisory opinions is not a judicial function, would then be controlling. However, we need not decide whether the statute was intended to have this broad effect. The statute certainly contemplates resort to this court by parties who are in fact engaged in a controversy over the constitutionality of the Housing Act and to this extent, at least, the statute calls upon the court to perform the same kind of function it regularly performs in declaratory judgment proceedings.

■ In the present case a controversy has arisen. The petitioner, Walsh Construction Co., is a builder of low-income housing and as such is eligible to become a "qualified housing sponsor" as defined in ORS 456.615 (14). Thus, petitioner is eligible to apply for and receive mortgage loans and financial assistance from the Housing Division, which in turn would be funded by the proceeds of the revenue bonds contemplated by ORS 456.615 through 456.720.

The petition alleges, and it has not been denied, that the respondent, as the administrator of the State Housing Division, is unable or unwilling to issue revenue bonds and proceed with the program contemplated in the 1973 Act in the absence of a clear declaration that ORS 456.720 (5) as amended by the 1975 Act, is constitutional.

Whatever reason the administrator advances for refusing to issue the bonds, the petitioner is adversely affected by the administrator's inaction and out of this divergence of positions a controversy arises. Moreover, the intervenors, who are given standing under Section 2 of the Act, have clearly created a controversial issue by appearing in these proceedings with the contention that the Act is unconstitutional.

■ The further contention of the intervenors that Section 2 is unconstitutional on the ground that Article VII (Amended) § 2, in providing that the Supreme Court has original jurisdiction in mandamus, quo warranto and habeas corpus proceedings is intended to define the only original jurisdiction of the Supreme Court, is without merit. Article VII (Amended), § 2 provides:

> "The courts, jurisdiction, and judicial system of Oregon, except so far as expressly changed by this amendment, shall remain as at present constituted *until otherwise provided by law.* But the supreme court may, in its own discretion, take original jurisdiction in mandamus, quo warranto and habeas corpus proceedings." (Emphasis added.)

The foregoing section of the constitution empowers the legislature to add to the original jurisdiction of the Supreme Court whatever judicial proceedings it deems fit.⑥ We hold, therefore, that the provisions of the Housing Act under attack do not violate any provision of the Oregon Constitution.

DENECKE, J., specially concurring.

I specially concur to point out that any legisla-

---

⑥ Intervenors quote from State ex rel Carson v. Oyer, 118 Or 556 at 558, 247 P 806 (1926), as follows: "* * * The mention of mandamus, quo warranto and habeas corpus proceedings as instances in which the Supreme Court may take original jurisdiction must be held to exclude all other cases." This was intended to mean only that the recited proceedings were intended to be exclusive *in the absence of legislative action conferring additional original jurisdiction.*

tion providing for "revenue" bonds is at least partially inconsistent with the basic policy underlying Art XI, § 7.

Art XI, § 7, provides that the legislature shall not create any indebtedness for the state in excess of $50,000. We are holding in this case and have held in other cases that when the state is not legally obligated to repay the debt out of the General Fund, which is the case in "revenue" bonds, Art XI, § 7 is not violated.

All counsel conceded at oral argument, however, that the state could not permit a default in the repayment of "revenue" bonds even though the revenue was insufficient for repayment. If the state did permit a default, the state credit rating would be lowered and the interest rate the state would have to pay would increase. Because of these practicalities, as a fiscal necessity, not as a legal obligation, the General Fund will be called upon to repay "revenue" bonds if the revenue is insufficient. This will occur whether the statute authorizing the bonds provides that the state "shall" repay, "may" repay or is silent.