AMERICAN NATIONAL BANK AND TRUST COMPANY, Appellant,

v.

INDIANA DEPARTMENT OF HIGHWAYS, Appellee.

No. 582S203.

Supreme Court of Indiana.

Sept. 17, 1982.

Rehearing Denied Dec. 6, 1982.

Warren A. Deahl, John L. Carey, Thomas L. Murray, Barnes & Thornburg, South Bend, for appellant American National Bank and Trust Co.

Linley E. Pearson, Atty. Gen., William E. Daily, Asst. Atty. Gen., Virgil L. Beeler, Thomas G. Stayton, Baker & Daniels, Indianapolis, for appellee Indiana Dept. of Highways.

PIVARNIK, Justice.

This appeal arises from the appellee's action for declaratory judgment in the Marion Circuit Court. Although this case was originally filed in the Court of Appeals under Cause No. 2–282 A 48, this Court entertains jurisdiction pursuant to Ind.R.App.P. 4(A)(10), upon the grounds that this appeal involves a substantial question of law of great public importance and that an emergency exists for speedy determination. Appellee, the Indiana Department of Highways, filed the petition for transfer; the appellant, American National Bank & Trust Co., later joined the petition, which was granted on May 27, 1982.

The original plaintiff, the Indiana Toll Road Commission, was created by the Indiana Legislature in 1951. Ind.Code § 8–15–2–3 (Burns 1973). The Commission was authorized and empowered "[t]o construct, maintain, repair, police and operate toll road projects ... and to issue toll road revenue bonds of the state of Indiana, payable solely from revenues, as herein provided, for the purpose of paying all or any part of the cost of any one or more toll road projects...." Ind.Code § 8–15–2–5(e) & (f) (Burns 1973). The Commission was a body both corporate and politic in the state and separate from the state in its sovereign capacity. In 1954, the Commission issued bonds for the construction and operation of a toll road across the northern portion of Indiana.

On September 1, 1980, the Indiana Toll Road Commission executed a trust agreement for the issuance of revenue bonds in the amount of $259,500,000 to pay the cost of construction on the toll road of six new interchanges, the completion of a seventh interchange, the purchase of land for two possible additional interchanges, and the reconstruction and modernization of toll collection facilities. The defendant, American National Bank and Trust Company, a national banking association with its principal banking office in South Bend, was a party, as original trustee, to the trust agreement. The 1980 trust agreement provides in § 3.15 that if proceeds from the sale of the 1980 bonds are not sufficient to pay the entire cost of the construction of the 1980 project, the Indiana Toll Road Commission is required to "issue Completion Bonds in such amount as is necessary to yield net proceeds to the Construction Fund sufficient ... to pay such deficit...." Record, p. 58. In order for the Toll Road Commission to issue completion bonds, it is necessary for American National Bank, as trustee, to authenticate and deliver the completion bonds. Under the provisions of §§ 3.15 and 3.12(a), before the trustee can authenticate and deliver the completion bonds, it must receive an unqualified opinion of bond counsel to the effect, among other matters, that the bonds of the particular series are valid and binding upon the Commission.

On March 30, 1980, Public Law 74 of the 1980 Session Laws (the Transportation Act) was approved which, in part, created the Indiana Department of Highways. Ind. Code § 8–9.5–4–1 et seq. (Burns Supp.1982). Effective July 1, 1981, the new Department of Highways was to assume all the powers, duties and liabilities of several Indiana agencies, among which were the Indiana Toll Road Commission and the Indiana State Highway Commission. Ind.Code § 8–9.5–4–10 (Burns Supp. 1982).

After the Transportation Act was passed by the legislature, but prior to the signing by Governor Bowen, Attorney General Sendak, in his official capacity, advised the governor that the act was unconstitutional. The Attorney General felt that the portions of the Transportation Act which would permit the newly created state agencies to issue revenue bonds conflict with Art. 10, § 5 of the Indiana Constitution, the ban against state bonded debt. Later, when it appeared that there would be cost overruns on the 1980 toll road project which would require an additional issue of completion bonds, American National Bank refused to authenticate and deliver additional bonds until bond counsel delivered its opinion about the proposed move, and bond counsel refused to deliver an opinion until the power and authority of the Department of Highways to issue revenue bonds is judicially determined to be valid. Accordingly, on June 19, 1981, the Indiana Toll Road Commission brought suit against American National Bank and Trust Co., seeking a declaratory judgment that the "issuance by the Department of Highways subsequent to June 30, 1981, of toll road revenue bonds in accordance with IC 8–15–2, payable solely from revenues of the Toll Road or from the proceeds of other toll road revenue bonds and the earnings thereon, will not create a debt of the State, and that the provisions of the Transportation Act, which authorize the Department of Highways to issue such bonds, do not violate Article 10, Section 5 of the Indiana Constitution...." Record, p. 8. Because the Indiana Toll Road Commission was abolished as of July 1, 1981, the Indiana Department of Highways was substituted as plaintiff.

The case was submitted for a decision on the pleadings and stipulated facts along with briefs filed by both parties. The trial court found that the questions presented, involving a grant of authority and the administration of a trust, affected the legal relations of the parties and presented a justiciable controversy appropriate for determination under the Uniform Declaratory Judgments Act, Ind.Code § 34–4–10–1, et seq. (Burns 1973). After reviewing the submitted materials, the trial court ruled that bonds may be issued by the Indiana Department of Highways without violating Art. 10, § 5 of the Indiana Constitution. The court held that the purpose of Art. 10, § 5 was to protect the credit and solvency of the state and because the revenue bonds were stipulated to be payable solely from a special fund, there was no obligation on the state to make payments on the bonds from a general fund or through its taxing power, and therefore the issuance of completion bonds by the Department of Highways would not constitute a debt of the state within the meaning of Art. 10, § 5. The court also felt that the status of the issuer, whether an agency of the state, such as the Department of Highways, or as a public corporate entity separate from the state in its sovereign capacity, such as the Toll Road Commission, was immaterial to the matter. Appellant American National Bank now appeals, alleging that the grant of authorization to the Indiana Department of Highways to issue toll road revenue bonds violates Art. 10, § 5 of the Indiana Constitution.

Appellant contends that the assumption by the state of Indiana, through the Department of Highways, of the obligation of the Toll Road Revenue Bonds, including the completion bonds, constitutes the assumption of debt by the state within the meaning and prohibition of Art. 10, § 5 of the Indiana Constitution. Appellant's contentions are based on the following facts and circumstances: 1) the Department of Highways is a state agency and is not an independent corporate entity in the nature of

the Toll Road Commission; 2) the Indiana Department of Highways, by the statute and by terms of the trust agreement, is obligated to maintain the toll road and at the same time is obligated to receive tax monies for the maintenance of all roads in the state; 3) the state has contracted in § 7.08 of the Trust Agreement to go to the Legislature for funds if the toll road revenues are insufficient to pay for its maintenance and operation; 4) the state itself is operating the Toll Road and therefore fixes the toll revenues, and if there are not sufficient revenues to pay the completion bonds, the state is obligated under the trust agreement to submit the request for the needed funds to the Legislature; and, 5) it is not sufficient to show that the bond obligations are designated to be paid from a special fund created by the revenues received in view of the fact that the obligor of the bonds is not an independent corporate entity but is the state of Indiana itself.

Department of Highways contends that whether the issuing entity is a department of the state or an independent corporate entity is immaterial to a determination of whether the bonds constitute debt of the state within the meaning of Art. 10 § 5, of the Indiana Constitution since the statute, the trust agreement, and the bonds themselves, provide that they will be paid from a special fund created by the revenues of the toll road.

■ This Court has always deemed it prudent and necessary to exercise self-restraint when called upon to review the constitutionality of a statute. We must always remember that while we have the duty to guard the constitution, we are nevertheless a court and not a legislature. Therefore, every statute upon review is clothed with the presumption of constitutionality, and such presumption continues until clearly overcome by a showing to the contrary. *Sidle v. Majors,* (1976) 264 Ind. 206, 209, 341 N.E.2d 763, 766. The burden of overcoming such presumption is placed upon the challenger to the statute. *Id.*

We have previously interpreted Art. 10, § 5 of the Indiana Constitution in cases

involving the undertaking of public projects necessitating the appropriation of funds and the issuing of bonds of indebtedness. In all of those cases, the project was being managed and paid for by bonds issued by a separate corporate entity or agency that committed the payment of the bonds out of a special fund created from the income of the special project. Therefore, the separate entity and the special fund was present in all those cases. This is the first instance in which we have been asked to interpret bonded indebtedness where there is no separate corporate entity but where the state of Indiana itself is managing the special project and issuing the bonds, albeit from a special fund. Among the helpful precedents for review are *Steup v. Indiana Housing Finance Authority,* (1980) Ind., 402 N.E.2d 1215; *Orbison v. Welsh,* (1962) 242 Ind. 385, 179 N.E.2d 727; *Book v. State Office Building Commission,* (1958) 238 Ind. 120, 149 N.E.2d 273; and *Ennis v. State Highway Commission,* (1952) 231 Ind. 311, 108 N.E.2d 687.

Art. 10, § 5 of the Indiana Constitution, the heart of this controversy, reads as follows:

"No law shall authorize any debt to be contracted, on behalf of the State, except in the following cases: To meet casual deficits in the revenue; to pay the interest on the State Debt; to repel invasion, suppress insurrection, or, if hostilities be threatened, provide for the public defense."

In *Ennis,* this Court found that the Indiana Toll Road Commission was a commission of the state created for a public purpose and was also a body both corporate and politic in the state. *Ennis, supra,* 231 Ind. at 324, 108 N.E.2d at 693. It was further noted that, under Section 20, Chapter 281 of the 1951 Acts, the State Highway Commission would be reimbursed for all funds expended:

" . . . for the study of any toll road project or projects and to use its engineering and other forces, including consulting engineers and traffic engineers, for the purpose of effecting such study,

and all such expenses incurred by the chairman of the state highway commission prior to the issuance of toll road revenue bonds ... shall be paid by the chairman and charged to the appropriate toll road project or projects...."

*Id.* at 319, 108 N.E.2d at 691.

The Court felt that such study and use of the State Highway Commission personnel was a proper cost of the toll road and properly connected with its construction.

Finally, the Court determined whether or not the issuance of bonds for the toll road project was in violation of Art. 10, § 5 of the state constitution. It was held that the issuance of the bonds did not create a debt of the state since no state tax monies were to be used to pay the revenue bonds. The Court stated:

"Bonds which are to be paid solely from the revenue collected from a project have been discussed by this court many times, and have been held not to create a debt of the municipal corporation involved, under Section 1, Article 13, of the Constitution of Indiana. *Property Owners, Inc. v. City of Anderson* (1952), 231 Ind. 78, 107 N.E.2d 3; *Edwards v. Housing Authority of City of Muncie* (1939), 215 Ind. 330, 19 N.E.2d 741; *Letz Mfg. Co. v. Public Service Commission of Ind.* (1936), 210 Ind. 467, 4 N.E.2d 194; *Underwood v. Fairbanks, Morse & Co.,* (1933), 205 Ind. 316, 185 N.E. 118; *Bennett v. Spencer County Bridge Comm.* (1938), 213 Ind. 520, 13 N.E.2d 547, *supra; Voss v. Waterloo Water Co.* (1904), 163 Ind. 69, 71 N.E. 208; *Jefferson School Twp. v. Jefferson Twp. S. Bldg. Co.* (1937), 212 Ind. 542, 10 N.E.2d 608; *Fox v. City of Bicknell* (1923), 193 Ind. 537, 141 N.E. 222.

We feel that the reasoning in the last-cited cases is equally applicable to the State of Indiana, and that therefore Chapter 281 of the Acts of 1951 does not violate Section 5, Article 10, of the Constitution of Indiana."

*Id.* at 336–37, 108 N.E.2d at 699.

The Department of Highways contends that the Court's reasoning above indicates that it is not necessary for there to be a separate corporate entity issuing the bonds so long as payment of the bonds is pledged from the special fund created by operation of the project. We believe this to be a narrower interpretation of the language of *Ennis* than was intended by the Court. We interpret *Ennis* to provide that the separate fund doctrine is applicable when the separate fund is managed and controlled by a separate corporate entity such as the Toll Road Commission in *Ennis*. Even though there were not separate corporate entities in all the municipal cases cited in *Ennis,* the Court, through later opinions involving commissions and authorities, made it clear that it did not intend to hold that a separate corporate entity was not necessary in complying with the mandate of Art. 10, § 5 of the Indiana Constitution regarding indebtedness of the State.

*Book v. State Office Building Commission,* (1958) 238 Ind. 120, 149 N.E.2d 273, involved a legislative act creating a commission to build a state office building. The Commission was authorized to issue and sell interest-bearing State Office Building revenue debentures and for the purpose of paying the principal and interest, the Commission was authorized to enter into agreements with various state agencies for the use and occupancy of the building. This Court compared the legislative language used in *Book* to the language used in the Toll Road Act (*Ennis*) and the Toll Bridge Act (*Indiana State Toll Bridge Commission v. Minor,* (1957) 236 Ind. 193, 139 N.E.2d 445) and stated:

"It seems to us that if the above language in the Toll Road Act created a corporation for a public purpose, and the language used in the Toll Bridge Act created a separate entity which might be considered as an instrumentality of, but not the State in its corporate sovereign capacity, it must follow that the Legislature, by the use of almost identical language in the State Office Building Act, created the same kind of creature. It is, therefore, our opinion that the State Office Building Commission is a separate corporate body created as an instrumen-

tality of the State for a public purpose, but it cannot be considered as the State of Indiana in its corporate sovereign capacity."

238 Ind. at 135–36, 149 N.E.2d at 282.

By providing that a separate corporate entity existed to be obligated on the bonds and that the payment to the bondholders had to be made from a special fund created by operation of the project, there was an assurance that bondholders could not proceed against the state since it was not a party to the debt agreement and that the bondholders contemplated payment from the special fund and not from tax monies of the state:

> "Since the Commission is a corporate body separate from the State of Indiana in its corporate sovereign capacity, the purchasers of the proposed debentures must rely upon the revenues derived from income from rentals of the building for the payment of interest and the retirement of the bonds as they become due."

*Id.* at 140, 149 N.E.2d at 284.

*Orbison, supra,* involved the creation of the Indiana Port Commission. In considering the appellant's contention that the act authorized the contraction of an unauthorized debt on behalf of the state in contravention of Art. 10, § 5 of the Indiana Constitution, the *Orbison* court held:

> "This Court has previously had this question before it in the cases involving the Toll Road Act, the Toll Bridge Act and the State Office Building Commission Act,[4] and in these cases, statutes almost identical in language, were held not to create a debt or obligation of the state. It will be noted that the Indiana Port Commission Act above quoted, expressly states that the port revenue bonds issued thereunder shall not constitute a debt or pledge of credit of the state or of any political subdivision but shall be payable solely from the funds pledged for their payment as authorized therein.
>
> In view of the foregoing provisions of the statute and the opinion we have previously expressed that the Port Commission is a corporate body separate from the

State of Indiana in its sovereign capacity, it follows that the purchasers of the proposed bonds will have no right of action against the state but must rely solely for payment upon funds pledged as provided in the statute.

> The Indiana Port Commission Act neither authorizes a debt to be contracted on behalf of the State, nor does it authorize a political corporation to contract debts in violation of Art. 10, § 5, or Art. 11, § 12 of the Indiana Constitution." [footnote omitted].

242 Ind. at 407–08, 179 N.E.2d at 738.

Finally, the most recent case concerning this issue is *Steup v. Indiana Housing Finance Authority,* (1980) Ind., 402 N.E.2d 1215. The legislative act involved was the Indiana Housing Finance Authority Act, Ind.Code § 5–20–1–1 *et seq.* (Burns Supp. 1979; now found in the 1982 Supp.), which was enacted to provide suitable housing for low and middle income residents of Indiana. This Court found the Authority was similar in nature to the commissions created to construct the Indiana Toll Road, *Ennis, supra;* the Indiana Toll Bridge, *Indiana State Toll Bridge Comm'n, supra;* the State Office Building, *Book, supra;* and an Indiana port, *Orbison, supra.* We then held that the Authority was "neither a state agency nor a private corporation" but a separate corporate entity which is an instrumentality or agency of the state although it is not the state in its sovereign capacity. *Id.* at 1218.

*Steup* then cited the above cases as authority for the proposition that appropriations advanced to commissions for public purposes and projects did not create an indebtedness of the state. *Id.* at 1219. *Steup* further cited Ind.Code § 5–20–1–16(a) which provided that the Authority may create and establish one or more capital reserve funds to secure notes or bonds referred to and defined in § 5–20–1–2(10) as obligations. § 5–20–1–8(a) authorized the Authority to issue bonds or notes or a combination thereof to carry out and effectuate its purposes and powers and provided that the principal and interest of such bonds and notes would be payable solely from the

funds provided for such payment in this chapter. § 5–20–1–7(a) expressly provided that the Authority's obligations do not constitute a debt, liability, or obligation of the state. *Steup* held that since there was no recourse against the state and its general fund to meet the Authority's obligations, the act creating the Authority did not create state indebtedness and therefore did not contravene Art. 10, § 5 of the Indiana Constitution. *Id.* at 1219.

■ In *Ennis, Orbison, Book,* and *Steup,* there was both a separate entity operating the special project and issuing the bonds of indebtedness as well as a provision for a special fund from which to maintain the project and retire the bonded indebtedness. Although the special fund is present in the case before us, the separate entity that was originally the Toll Road Commission is not. The state of Indiana, through its Highway Department, is responsible for the maintenance and operation of the Toll Road and it is the one obligated on and issuing the bonds of indebtedness as to the $259,500,000 now extant and the completion bonds needed for further work. For this Court to provide that the legislation involved here is constitutional merely upon the existence of a special fund doctrine, would be to provide that any and every agency of the state could issue bonds of indebtedness so long as that authorization provided for special funds from which to pay that indebtedness. This would be nothing short of once again opening the floodgates of authorizing unlimited state indebtedness, thereby vitiating the very purpose of Art. 10, § 5 of the Indiana Constitution. If this is allowed, then the debt limitation of the Indiana Constitution is, for all practical purposes, nullified. *Compare Rappaport v. Department of Public Health and Hospitals,* (1949) 227 Ind. 508, 87 N.E.2d 77.

The judgment of the trial court is reversed. The Transportation Act passed in 1980 by the Indiana Legislature is unconstitutional to the extent that it grants authorization to the Indiana Department of Highways to issue toll road revenue bonds in contravention of Art. 10, § 5 of the Indiana Constitution.

GIVAN, C. J., and DeBRULER, J., concur.

PRENTICE, J., dissents with separate opinion in which HUNTER, J., concurs.

HUNTER, J., dissents with separate opinion.

PRENTICE, Justice, dissenting.

"It has been said that it is the spirit which vivifies and the letter which killeth." *Downes v. Bidwell,* (1901) 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088.

In *State v. Nixon,* (1979) Ind., 384 N.E.2d 152, 157, we stated that the fundamental principle of constitutional construction is to give effect to the intent of those who framed and adopted the organic law and that those of us charged with responsibility for the task should " 'look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, *to ascertain the old law, the mischief and the remedy.*' (emphasis added)." Citing *State v. Gibson,* (1871) 36 Ind. 389, 391.

The mischief that Article 10, Section 5 of our State Constitution seeks to proscribe is the obligating of the future revenues of the state by those in power for the moment. Any scheme or combination of schemes that can accomplish the financing of public projects without creating an obligation upon the state is, therefore, lawful, and any scheme or combination of schemes which obligates the future revenues of the state or its property, other than such revenues or property which are created by the scheme, is unlawful.

One such scheme that has been successfully utilized is the creation of a separate legal entity to develop the asset and be responsible for the debt. Such scheme is lawful, not because it embodies a separate legal entity but because the public, although having the benefit of the property, is insulated from liability upon the debt created.

Another such scheme to avoid being in violation of a very similar proscription has been employed by cities and towns with respect to Article 13, Section 1 of our Constitution. In cases cited in the majority opinion, we have held that obligations issued by such municipalities were not violative of the constitution, since they were payable from revenues of the project only and not from the general revenues. The revenues and property sought to be protected by the debt proscription, although not insulated from the obligation by the veil of a separate legal entity, were insulated, nevertheless, by the exculpatory language of the debt instruments.

The majority opinion has concentrated, to a degree, upon the funds from which the bonds are payable; but the question of constitutionality must be answered not by a determination of the funds from which they are payable but by a determination of the funds from which they are *not* payable. Whether or not they are ever paid is of no moment, under the constitution, so long as payment cannot be compelled from the general revenues.

It is immaterial that, as pointed out by the majority, the state has heretofore utilized both a separate legal entity and exculpatory language and has thusly doubly insulated itself. I believe, however, that, as between the two, the mandate for clear exculpatory language contained in the statute and consequent, clear exculpatory language in the debt instrument are of more importance than the employment of a specially created separate legal entity which might be regarded as a mere ruse designed by the state to mislead the investors.

Lastly, I note that the appellant discounts the authority of those cases where municipalities have employed exculpatory language alone by pointing out that the proscription against the state is the authorization of debt, except under certain. enumerated circumstances, whereas the proscription against the municipalities is the authorization of debt in excess of two percentum, etc. Such distinction will not bear scrutiny. Both constitutional provisions are designed to limit public debt, except under enumerated exceptions. That the exception provided in one is an authorized amount of debt and the exceptions provided in the other are emergency events is immaterial to the issue, which is whether or not the financing scheme can operate without obligating the general revenues.

I would hold the statute to be constitutional and affirm the trial court.

HUNTER, J., concurs with separate opinion.

HUNTER, Justice, dissenting.

I must respectfully dissent from the majority opinion. Much has been ignored by the majority en route to its conclusion that Ind.Code § 8–15–2–1 *et seq.* (Burns 1982 Supp.) is unconstitutional "to the extent that it grants authorization to the Indiana Department of Highways to issue toll road revenue bonds . . . ." *Majority Opinion, supra.*

For instance, the majority has not acknowledged the legislature's mandate in Ind.Code § 8–15–2–2, *supra,* entitled "Toll road revenue bonds—Limitation of liability":

"Toll road revenue bonds issued under the provisions of this chapter shall not be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision, but such bonds shall be payable solely from the funds pledged for their payment as authorized by this chapter, unless such bonds are refunded by refunding bonds, issued under the provisions of this chapter, which refunding bonds shall be payable solely from funds pledged for their payment as authorized by this chapter. All such revenue bonds shall contain on the face thereof a statement to the effect that the bonds, as to both principal and interest, are not an obligation of the state of Indiana, or of any political subdivision thereof, but are payable solely from funds pledged for their payment, as authorized by this chapter.

"All expenses incurred in carrying out the provisions of this chapter shall be payable solely from funds provided under the authority of this chapter and nothing in this chapter contained shall be construed to authorize the department to incur indebtedness or liability on behalf of or payable by the state or any political subdivision thereof."

Nor has the majority acknowledged the existence of the legislature's requirement that "The principal of and the interest on such bonds [toll road revenue bonds] shall be payable solely from the revenues or from the proceeds of bonds ... and earnings thereon, or from both." Ind.Code § 8–15–2–9, *supra.*

Likewise, the majority has failed to observe that the bonds at issue in the instant cause bear on their face the following statement:

"Under the Act [Ind.Code § 8–15–2–1 et seq., *supra*], the Bonds shall not be deemed to constitute a debt of the State of Indiana or of any political subdivision thereof or a pledge of the faith and credit of said State or of any such political subdivision. The Bonds, as to both principal and interest, are not an obligation of the State of Indiana or of any political subdivision thereof, but are payable solely from the funds pledged for their payment."

Similarly, the majority has failed to state that Article XII, Section 12.01 of the Trust Agreement is explicit with respect to the matter before us:

"SECTION 12.01. *Credit of State or Any Political Subdivision Not Pledged.* Nothing in the Bonds or coupons or in this 1980 Trust Agreement shall be construed as pledging the faith and credit of the State of Indiana or any political subdivision thereof for their payment, or to create any debt against said State or any political subdivision thereof."

These unequivocal statements common to the governing statutory scheme, the revenue bonds at issue, and the trust agreement before us cannot be ignored.

These declarations belie the majority's notion that Ind.Code § 8–15–2–1 *et seq., supra,* creates a "debt" upon the state, as that term is employed in Article 10, Section 5, of our Constitution. In the context of cases identical to the one before us, this Court has repeatedly stated that the constitutional term "debt" applies only to "legally enforceable obligations." *Book v. State Office Bldg. Comm. et al.,* (1958) 238 Ind. 120, 148, 149 N.E.2d 273, 289; *accord, Kees v. Smith,* (1956) 235 Ind. 687, 137 N.E.2d 541; *Protsman v. Jefferson-Craig Consol. School Corp.,* (1953) 231 Ind. 527, 109 N.E.2d 889.

In the face of the unequivocal language employed by the legislature and the equally unequivocal statements on the face of the bonds and trust agreement, there simply is no "legally enforceable obligation" created here. Nor does the majority explain how a legally enforceable obligation of the state is created.

Neither does the majority explain why the statutory scheme at issue should be declared unconstitutional under Article 10, Section 5, when identical municipal schemes have been ruled constitutional under Article 13, Section 1, which proscribes indebtedness of municipal corporations in this state. The application of the latter constitutional provision was discussed in *Book v. State Office Bldg. Comm. et al., supra:*

"The law is well-settled in Indiana that, 'Bonds which are to be paid solely from the revenue collected from a project' do not 'create a debt of the municipal corporation involved, under Section 1, Article 13, of the Constitution of Indiana.' *Ennis v. State Highway Commission, supra,* at page 336 of 231 Ind., at page 699 of 108 N.E.2d, and cases there cited.

The provision pertaining to the creation of a debt in Art. 10, § 5, *supra,* is of no greater weight than the provision in Art. 13, § 1 pertaining to the creation of a debt by political or municipal corporations; hence the rule as followed in this State with reference to the creation of a debt through the issuance of revenue bonds by municipal corporations applies with equal force to the State of Indiana.

*Ennis v. State Highway Commission, supra,* 1952, 231 Ind. 311, 337, 108 N.E.2d 687, 699; *Loomis v. Keehn,* 1948, 400 Ill. 337, 341, 80 N.E.2d 368, 371; *McArthur v. Smallwood,* 1955, 225 Ark. 328, 337, 281 S.W.2d 428, 434; *Kelley v. Earle, supra,* 1937, 325 Pa. 337, 347, 190 A. 140, 145; *State ex rel. Watson v. Caldwell,* 1945, 156 Fla. 618, 621, 23 So.2d 855, 857; *Sheffield v. State School Bldg. Authority,* 1952, 208 Ga. 575, 68 S.E.2d 590; *State ex rel. Thomson v. Giessel,* 1955, 271 Wis. 15, 41, 72 N.W.2d 577, 590." *Id.,* 238 Ind. at 139, 149 N.E.2d at 283–4.

As this Court in *Book* expressly recognized the two constitutional provisions are of equal force and weight, the majority implicitly overrules that aspect of *Book.* In its place, we gain a wholly arbitrary distinction, albeit without rationale.

It is noted that pursuant to Article 7, Section 7.08 of the trust agreement executed by the parties, the following duty is imposed on the Department of Highways:

"If, despite use of best efforts to fix, charge and collect tolls and charges for use of the Toll Road adequate to meet the Net Revenue Requirement as provided above, the Commission [Department of Highways] is unable to charge and collect such level of tolls and charges, the Commission covenants that at the appropriate time or times it will report and *propose* to the State Budget Agency that there be included in each budget bill an appropriation by the Legislature to the Commission sufficient to pay the Operating Expenses of the Toll Road for the budget period but not in excess of that amount which will permit the application of additional amounts from the Revenue Fund so that the Commission will meet the Net Revenue Requirement." (Emphasis added.)

As emphasized, the provision requires the Department of Highways to "*propose*" the legislature appropriate funds if revenues are inadequate to meet the requirements of the trust agreement. Although the position is not embraced by the majority, American National Bank and Trust Company has argued that the provision establishes the existence of a debt on the part of the state.

The argument was rejected by this Court in *Steup v. Indiana Housing Finance Authority,* (1980) Ind., 402 N.E.2d 1215, 1219:

"Furthermore, the legislature *may* appropriate funds to the capital reserve fund. However, no funds can flow into the reserve fund unless and until there is an appropriation by the legislature. The Act allows but does not require such appropriations. In *Utah Housing Finance Agency v. Smart,* (1977) Utah, 561 P.2d 1052, 1056, the Utah Supreme Court stated:

"'If the legislation requires future appropriations to defray the obligations of the Agency it would be invalid as lending the state's credit, but where, as here, it merely allows future appropriations without requiring such, it creates no binding obligation upon the state and therefore does not result in a debt of the state or the lending of the state's credit.'

"We hold that the Act does not create a state indebtedness and, therefore, does not contravene Ind.Const. Art. 10, § 5."

Likewise, the trust agreement here obviously creates no obligation on the part of the legislature.

*Steup* bears out the fallacy of the majority's insistence that the existence of a separate corporate entity is dispositive in the determination of what constitutes a "debt" within the meaning of Article 10, Section 5. In either case, the legislature *may* appropriate money to support the revenue bonds. What is significant, however, is whether the legislature is *required* to make such an appropriation. Here, no such requirement exists, nor is the state general fund obligated.

As Justice Prentice has explained in his dissenting opinion, that renders the separate corporate entity an artificial device, a mere "veil" without significance in the determination of whether a "debt" within the meaning of Article 10, Section 5, has been created. The trial court reached the identical conclusion in finding Ind.Code § 8–15–2–1 *et seq., supra,* was not unconstitutional. And the vast majority of jurisdictions

which have confronted the question before us have reached the same conclusion. Those states have held that the financing of a special state project through bonds to be paid solely from the revenues of the special project, and which neither obligate the state's general fund nor pledge the credit of the state, did not violate constitutional prohibitions against indebtedness. The validity of the "special fund" doctrine is widely recognized. *See e.g., Clipson v. State Board of Education,* (1960) 271 Ala. 160, 123 So.2d 16; *Arizona State Highway Comm. v. Nelson,* (1969) 105 Ariz. 76, 459 P.2d 509; *California Toll Bridge Authority v. Kelly,* (1933) 218 Cal. 7, 21 P.2d 425; *Johnson v. McDonald,* (1935) 97 Colo. 324, 49 P.2d 1017; *State v. Florida State Improvement Commission,* (1948) 160 Fla. 230, 34 So.2d 443; *Farrell v. State Board of Regents,* (Iowa 1970) 179 N.W.2d 533; *Meagher v. Commonwealth ex rel. Unemployment Comp. Comm.,* (1947) 305 Ky. 289, 203 S.W.2d 35; *Schureman v. State Highway Commission,* (1966) 377 Mich. 609, 141 N.W.2d 62; *Naftalin v. King,* (1960) 257 Minn. 498, 102 N.W.2d 301; *State ex rel. Dragstedt v. State Board of Education,* (1936) 103 Mont. 336, 62 P.2d 330; *State ex rel. Capitol Addition Bldg. Comm. v. Connelly,* (1935) 39 N.M. 312, 46 P.2d 1097; *State v. Jones,* (1946) 74 N.D. 465, 23 N.W.2d 54; *Application of Oklahoma Planning and Resources Bd.,* (1949) 201 Okla. 178, 203 P.2d 415; *Moses v. Meier,* (1934) 148 Or. 185, 35 P.2d 981; *State v. Byrnes,* (1951) 219 S.C. 485, 66 S.E.2d 33; *State v. Giessel,* (1955) 271 Wis. 15, 72 N.W.2d 577; *State ex rel. Wyoming Farm Loan Bd. v. Herschler,* (1981) Wyo., 622 P.2d 1378. *See generally,* 81A C.J.S. States § 221, p. 785 (1977).

The majority suggests that the application of the "special fund" doctrine, as envisaged by our General Assembly in its enactment of Ind.Code § 8–15–2–2, *supra,* would result in "once again opening the floodgates of authorizing unlimited state indebtedness." *Majority Opinion, supra.* The majority's use of the phrase "once again" apparently is a reference to the era in this state's financial history which prompted the framers of our Constitution to insert Article 10, Section 5, into that document in 1851.

During the 1830s and 1840s, the infancy of our statehood, our state government had embarked on a bevy of public works projects to achieve the internal improvements deemed necessary to sustain the state's cultural and commercial growth. Foremost among the projects was the construction of the Wabash and Erie Canal. Bonds to finance the construction were authorized by the General Assembly in 1835. Acts 1835, c. 2, p. 6. Pursuant to the statute, the bonds were issued from 1835 until 1839, when the market failed; the bonds expressly obligated the state and its general revenues. Ultimately, the state fell into arrears on its financial responsibilities under the bonds and was forced to call in the state stock and enter into an agreement with bondholders whereby "canal stock" was issued, payable only from the revenues of the canal and unsecured by the state. *See generally,* Bates, *The Borrowing Power Under the "Casual Debt" Proviso of the Indiana Constitution* 8 Ind.L.J. 341 (1933).

The majority's fear that history will repeat itself—that this state's financial condition will be plunged "once again" into debt—is unfounded. Unlike the state-secured bonds issued from 1835 to 1839 to finance construction of the Wabash and Erie Canal, the toll road revenue bonds, by the very legislative language authorizing the issuance of them, specifically "are not an obligation of the state" and do not constitute "a debt of the State of Indiana or of any political subdivision thereof or a pledge of the faith and credit of said State or of any such political subdivision." Ind.Code § 8–15–2–2, *supra.*

It simply cannot be said that a state "debt," a "legally enforceable obligation," is created by the legislature's language. To assume that the "floodgates" of "unlimited state indebtedness" are opened by statutory language such as that before us is to assume that the legislature will authorize project after project wherein the special revenues designated to finance the improvement will be inadequate to meet the responsibility, that shortsighted financial

institutions and investors will flock to the schemes like lambs to the slaughter, and that the legislature will repeatedly bail out the projects with appropriations from general revenues, leaving the state unable to meet its total financial obligations.

It is not this Court's prerogative, however, to prospectively question the wisdom of our General Assembly and speculate or assume its future legislation will take a certain course. Here, the legislature has merely passed responsibility for the operation of the toll road from the Toll Road Commission to the Department of Highways. The powers and revenue-producing responsibilities have remained unchanged; the issue before us involves a special funding mechanism for the completion of a special public project. The wisdom of all this is not for us to question; only its constitutionality is at issue.

In resolving that question, it is well established that the statute comes before this Court clothed with a presumption of constitutionality. The burden of prove otherwise rests with the party challenging the statute. *Dague v. Piper Aircraft Corp.,* (1981) Ind., 418 N.E.2d 207; *Short v. Texaco, Inc.,* (1980) Ind., 406 N.E.2d 625; *Johnson v. St. Vincent Hospital, Inc.,* (1980) Ind., 404 N.E.2d 585; *Sidle v. Majors,* (1976) 264 Ind. 206, 341 N.E.2d 763; *Allen v. Pavach,* (1975) 263 Ind. 574, 335 N.E.2d 219; *Chaffin v. Nicosia,* (1974) 261 Ind. 698, 310 N.E.2d 867; *City of Aurora v. Bryant,* (1960) 240 Ind. 492, 165 N.E.2d 141.

Here, that burden has not been satisfied. Where doubts exist as to the validity of a statute, those doubts must be resolved in favor of the statute's constitutionality. *Id.* In that respect, I agree with the majority that "We must always remember that while we have the duty to guard the constitution, we are nevertheless a court and not a legislature." *Majority Opinion, supra.* Ultimately, that is in fact the foremost reason for my refusal to join the majority.

It is my belief that a case of such public importance and interest, involving as it does the legislature's view of the statute's nonbinding effect on the state's general reve-

nues, demands a more in-depth and cautious scrutiny than that which is revealed in the majority opinion.

For all the foregoing reasons, I dissent. The judgment of the trial court should be affirmed.

I dissent.